William J. USERY, Jr., Secretary of Labor, et al., Appellants,

v.

LOCAL UNION NO. 639 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Ind.

No. 74–1851.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 26, 1975.

Decided Aug. 27, 1976.

John V. Long and Lester M. Bridgeman, Washington, D. C., for appellants.

Harold A. Mouzon, Jr., Atty., U. S. Dept. of Labor with whom Morton Hollander, Atty., Dept. of Justice, Washington, D. C., was on the brief for appellee Dunlop.

Solomon G. Lippman, Washington, D. C., with whom Thomas J. Hart, Washington, D. C., was on the brief for appellee Local 639 IBT.

Michael H. Gottesman and Robert M. Weinberg, Washington, D. C., filed a brief on behalf of United Steelworkers of America, AFL–CIO as amicus curiae.

Joseph L. Rauh, Jr., Washington, D. C., filed a brief on behalf of Edward Sadlowski as amicus curiae.

1. *See* Senate Comm. on Improper Activities in the Labor or Management Field, First Interim Report, S.Rep. No. 1417, 85th Cong., 2d Sess. (1958); Second Interim Report, S.Rep. No. 621, 86th Cong., 1st Sess. (1959).

Before WRIGHT, LEVENTHAL and WILKEY, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

This is an appeal from two orders of the District Court, entered on June 24, 1974, in an action brought by the Secretary of Labor (Secretary), appellee here, under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 481 *et seq.* The first order granted final judgment, without evidentiary hearing, approving the Secretary's certification of the results of an election conducted under his supervision by defendant local union, appellee here. The court decreed that the persons named in the certification were the duly elected officials of the union, and appeal is brought by intervenors, defeated candidates who were not certified. The second order denied the motion of those intervenor-plaintiffs for an award of attorney's fees, costs and suit money. The Secretary, while defending the District Court's approval of his certification, takes no position on the order denying the award of fees. The case presents significant questions of interpretation of Title IV, as to the court's role at the remedial stage of an enforcement suit to set aside an unlawful union election. We affirm the District Court's judgment approving the Secretary's certification, but reverse and remand the case on the attorney's fees issue.

## I. BACKGROUND

### A. *Statutory Scheme*

In response to findings of extensive corruption and improper fiscal and electoral practices by labor unions,[1] Congress passed the LMRDA in 1959. That law injected into the pre-existing scheme of self-regulation an unprecedented dose of federal regulation of the internal affairs of labor organizations. Title IV, set out in the Appendix,

implements a federal guarantee of "free and democratic unionism." Section 401 of LMRDA, 29 U.S.C. § 481, is a core provision. It establishes procedural safeguards for the conduct of union elections, and for the exercise of candidacy and voting rights by union members. However, Congress wished to maximize union democracy at minimal cost to union institutional effectiveness. Hence it vested primary enforcement responsibility for Title IV in the Secretary of Labor and provided an exclusive post-election remedy under the Secretary's stewardship. Certain LMRDA provisions concerning pre-election union conduct,[2] including section 401(c),[3] are enforceable in suits brought by individual union members. "Provisions concerning the conduct of the election itself, however, may be enforced only according to post-election procedures specified" in section 402, 29 U.S.C. § 482. *Dunlop v. Bachowski,* 421 U.S. 560, 566, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975).[4] Those procedures are as follows:

A union member with a grievance must first invoke his internal union remedies. If he is unable to obtain a satisfactory resolution within three months of the contested election, he files a complaint with the Secretary. If upon investigation the Secretary finds probable cause to believe a violation of Title IV has occurred and has not been remedied, he is authorized[5] to bring suit in federal district court, within sixty days of the complaint,[6] to set aside the election. If the court determines upon a preponderance of the evidence "that the violation . . . may have affected the outcome of an election," it is directed to "declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable," in conformity with the union's constitution and bylaws. After the supervised election is held, "[t]he Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization."

## B. *The Instant Case*

Daniel George and Phillip Feaster, candidates for union office, were defeated in the regular election held January 23, 1972 by defendant Teamsters Local 639. After unsuccessful exhaustion of internal remedies, they filed a timely complaint with the Secretary. On September 20, 1972, the Secretary filed suit under section 402, attacking the election held by Local 639 as invalid because the union had (a) failed to notify its members of the election, (b) used an invalid attendance requirement for candidate eligi-

---

**2.** Title I, 29 U.S.C. §§ 411–15 ("bill of rights" guarantees and prohibition on discipline for exercise of rights under the LMRDA); Title II, *id.* § 431 (right to examine union books, records and accounts); Title III, *id.* §§ 461–66 (union trusteeship regulation); Title V, *id.* § 501 (fiduciary obligations of union officials).

**3.** Section 401(c), 29 U.S.C. § 481(c), is the sole exception to the administrative scheme for Title IV, permitting "suits prior to election . . . by any bona fide candidate for union office to enforce the rights, guaranteed by that section, to equal treatment in the distribution of campaign literature and access to membership lists." *Calhoon v. Harvey,* 379 U.S. 134, 140 n.13, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964). The provision also guarantees "adequate safeguards to insure a fair election," and this was one of the bases for the pre-election suit in *Yablonski v. United Mine Workers,* 305 F.Supp. 868, *order clarified, id.* at 876 (D.D.C. 1969), *discussed in* 151 U.S.App.D.C. 253, 466 F.2d 424 (1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973). *See* note 35 *infra.*

**4.** *See generally* Note, *Pre-Election Remedies Under the Landrum-Griffin Act: The "Twilight Zone" Between Election Rights Under Title IV and the Guarantees of Titles I and V,* 74 Colum. L.Rev. 1105 (1974); Note, *Union Elections and the LMRDA,* 81 Yale L.J. 407, 545–65 (1972).

**5.** Although the language of section 402(b) seems mandatory, the Secretary has discretion to determine both whether there has been a probable violation and whether the outcome of the election was probably affected by the violation. *Wirtz v. Local 153, Glass Bottle Blowers,* 389 U.S. 463, 472, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968); *Dunlop v. Bachowski,* 421 U.S. 560, 570, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), *discussed at* pp. —— ——, —— —— of 177 U.S.App.D.C., pp. 376, 378 of 543 F.2d *infra.*

**6.** *See* note 55 and accompanying text *infra.*

bility, and (c) made use of union funds to promote the candidacy of the incumbents. George and Feaster intervened as plaintiffs in support of the Secretary's complaint, under the authority of *Trbovich v. United Mine Workers,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).[7]

On August 21, 1973, the District Court granted the motions for summary judgment filed by the Secretary and by the intervenor-plaintiffs. The court directed defendant to conduct a new election of officers under the Secretary's supervision. Defendant appealed, but on March 8, 1974, this court affirmed the grant of summary judgment, *Brennan v. Local Union 639, Int'l Bhd. of Teamsters,* 161 U.S.App.D.C. 173, 494 F.2d 1092 (1974).

Meanwhile, on December 16, 1973, after oral argument in this court, the ballots for the rerun election were cast, although they were not counted until March 18, 1974. Intervenor-plaintiffs and other members of Local 639 were dissatisfied with the outcome. On March 26, 1974, they filed with the Secretary of Labor a protest of the supervised election. The Secretary investigated the protest, and rejected it. On June 12, 1974, he certified the results of the rerun to the District Court. On June 24, 1974, the District Court issued the two orders on appeal here.

7. During months immediately before and after institution of the suit, defendant attempted to remove complainant George, who was a leader of the dissident forces in the local union, from union membership. On May 10, 1973, upon the Secretary's motion, the District Court enjoined defendant from subjecting any of its members to penalty, discipline or improper interference in violation of section 401, and directed George's reinstatement as a member in good standing.

8. Although we read appellee Local 639's position as contesting both reviewability and standing, the Secretary of Labor concedes that "[t]he court must, of course, determine for itself whether to approve the certification of a supervised election," but urges that the "judicial obligation to insure that its decree conforms to the legal requirements of the Act must be viewed in conjunction with the Secretary's statutory responsibilities." Brief of Appellee John T. Dunlop, Sec'y of Labor, at 16. Our

## II. THE JUDGMENT APPROVING THE SECRETARY'S CERTIFICATION

Before we can determine on the merits whether the District Court properly upheld the Secretary's certification, we must confront the threshold questions of reviewability, standing and scope of judicial review.

### A. *Reviewability*[8]

Section 402 directs that "[t]he Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization." The question arises whether this seemingly mandatory language identifies the court's role as being of a non-judicial ministerial nature, to "rubber stamp" the Secretary's certification by issuing a decree incorporating the Secretary's determination as to winners of the contest.

We adopt the view of Judge Gibbons, writing for the Third Circuit, that section 402 when read in its entirety "imposes upon the court a *judicial obligation* with respect to enforcement of the Secretary's certification." *Hodgson v. Carpenters Resilient Flooring Local Union No. 2212,* 457 F.2d 1364, 1368 (3d Cir. 1972) (emphasis supplied.)[9] The court's function is to attach its imprimatur to the Secre-

decision is in accord with the Secretary's position. *See* text at pp. ——–—— of 177 U.S. App.D.C., pp. 377–379 of 543 F.2d *infra.*

9. *See Brennan v. Local 551, United Auto Workers,* 486 F.2d 6, 7–8 (7th Cir. 1973); *Brennan v. Sindicato Empleados de Equipo Pesado,* 370 F.Supp. 872, 880 (D.P.R.1974); *Hodgson v. Chain Service Rest. Employees Union Local 11,* 355 F.Supp. 180, 188–89 (S.D.N.Y.1973). *Cf. Hodgson v. Int'l Union of Electrical Workers Local 485,* 503 F.2d 219, 223–24(2d Cir. 1974); *Wirtz v. Local Union No. 1377, Int'l Bhd. of Electrical Workers,* 299 F. Supp. 641, 642 (N.D. Ohio 1969).

*Contra, Brennan v. Silvergate Dist. Lodge No. 50, Machinists,* 503 F.2d 800, 807–08 (9th Cir. 1974), *discussed in* note 15 *infra* ; *Morrissey v. Shultz,* 311 F.Supp. 744, 746 (S.D.N.Y.1970) (no subject matter jurisdiction for separate action by union member challenging Secretary's certification).

tary's certification only if it is satisfied that the supervised election has been conducted in conformance with legal requirements. The Secretary's prayer for relief asks the court to direct the conduct of the rerun election "in accordance with the provisions of [Title IV] and such rules and regulations as the Secretary may prescribe." Under the statute, the court directs the supervised rerun "so far as lawful and practicable, in conformity with the constitution and by-laws of the labor organization." Section 402(c), 29 U.S.C. § 482(c). Thus, the statute confers an independent responsibility on the reviewing court, one which requires the aid of the Secretary but which cannot be discharged by mechanical ratification of his determination.[10] Moreover, a court's order "designating elected officials of a labor organization shall be appealable in the same manner as the final judgment in a civil action . . . ." Section 402(d), 29 U.S.C. § 482(d). Appealability entails reviewability. This permits appellate review at the behest of both the labor organization[11] and candidates complaining of the manner in which the Secretary-supervised election was held.

■ In *Dunlop v. Bachowski,* the Supreme Court held that even the Secretary's initial decision—whether or not to bring a section 402 action to set aside the union election—was judicially reviewable, on an "arbitrary and capricious" standard. The Court declared that the Secretary "failed to make a showing of 'clear and convincing evidence' that Congress meant to prohibit all judicial review of his decision." 421 U.S. at 568, 95 S.Ct. at 1858. It follows that the Secretary's determination as to the validity of the election held under his supervision is also subject to judicial review. In *Bachowski* a reviewing court was interposed even in a case of failure to take action, where the Secretary has broad latitude because of his "special responsibility" to protect unions from frivolous litigation,[12] and the situation presents sensitive problems akin to judicial review of prosecutorial discretion.[13] Where, as here, the Secretary has exercised his discretion affirmatively and has called on the court to provide a judicial decree in fulfillment of the statutory mandate, the premise of reviewability is clear. "The Secretary's distinctive discretion to decide whether to bring a Title IV action does not, of course, give him exclusive power to direct the future course of an action brought."[14] *Brennan v. International Union of Dist. 50, Allied and Technical Workers,* 163 U.S.App.D.C. 46, 51, 499 F.2d 1051, 1056 (1974).

### B. *Standing*

The Secretary and appellee Local 639 argue that appellants lack standing to contest the Secretary's certification because they are in the case only as "second-class" parties under the qualified intervention permitted by *Trbovich v. United Mine Workers,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). In *Trbovich* the Court restricted the intervention of complainant union members to the presentation of evidence

**10.** *See also Trbovich v. United Mine Workers,* 404 U.S. 528, 537 n.8, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) (court in fashioning suitable remedial order is not limited to consideration of remedies proposed by the Secretary).

**11.** *See Hodgson v. Carpenters Resilient Flooring Local Union No. 2212,* 457 F.2d 1364, 1368 (3d Cir. 1972).

**12.** *See Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964); *Trbovich v. United Mine Workers,* 404 U.S. 528, 532, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).

**13.** *See Bachowski v. Brennan,* 502 F.2d 79, 86–88 & cases cited therein (3d Cir. 1974), *rev'd and remanded,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). The Supreme Court rejected the analogy to unreviewable prosecutorial discretion, 421 U.S. at 567 n.7, 95 S.Ct. 1851, but sidestepped the question of whether the district court, on a finding of abuse of discretion, can order the Secretary to bring a section 402 action. *Compare* 421 U.S. at 575, 95 S.Ct. 1851, *with id.* at 592, 594–98, 95 S.Ct. 1851 (Rehnquist, J., concurring in part and dissenting in part). *See generally* Note, *Reviewability of Prosecutorial Discretion: Failure to Prosecute,* 75 Colum.L.Rev. 130 (1975).

**14.** *See Hodgson v. Carpenters Resilient Flooring Local Union No. 2212,* 457 F.2d 1364, 1367–68 (3d Cir. 1972).

and argument in support of the grounds of illegality in the Secretary's complaint. Recognizing standing in such intervenors, appellees contend, would countermand the teaching of *Trbovich,* that "Congress intended to insulate the union from any complaint that did not appear meritorious to both a complaining member and the Secretary." 404 U.S. at 537, 92 S.Ct. at 636.

■ In our view, the *Trbovich* holding is limited in terms to the situation of "a post-election enforcement suit." The Court in a footnote makes clear that its limitation on complainant intervention "applies only to the claimed grounds for setting aside the old election, and not to the proposed terms of any new one that may be ordered." Intervenors may assist the court in fashioning a suitable remedial order, going beyond the remedies proposed by the Secretary, because once "the court finds merit in the Secretary's complaint and sets the election aside, then the statute requires the court to direct a new election in conformity with the constitution and bylaws of the union, and the requirements of Title IV." 404 U.S. at 537 & n.8, 92 S.Ct. at 636.

■ Once the remedial stage is reached, the intervenor acquires full party status, to reflect the shift in statutory focus. With the original election set aside, the Secretary's role is no longer one of applying his special expertise to vindicate the statutory policy in a manner which insulates unions from frivolous suits and undue governmental intervention. At this point, his primary responsibility is to aid the court in fulfilling *its* obligation to ensure that the supervised election is conducted in accordance with the law. And in this process, as in the earlier formulation of a suitable remedial order, there is no basis in the statutory scheme for curtailing the intervenor's assistance to the court. Of course as we develop below, the Secretary's discretion and expertise remain important, and there is room for appreciation of his ameliorative skills, but the responsibility is now that of the court, not the Secretary.[15]

### C. Scope of Review

■ The precise question of the scope of review of the Secretary's certification has not been previously passed on by this court, although we broached the point in *Brennan v. Int'l Union of Dist. 50.* This court solicited the views of the Secretary as to whether a Title IV action against District 50 should be stayed pending the outcome of a membership referendum to decide whether that union would merge with another union. The Secretary advised that the merger referendum should proceed, and we noted that "although not decisive, the Secretary's voice, informed by his familiarity with the matters pertaining to union elections and the vindication of Labor's Bill of Rights, is rightly accorded weight by the court." 163 U.S.App.D.C. at 51, 499 F.2d at 1056. We also credited the Secretary's expertise, in approving his decision to proceed by mail balloting rather than in-person balloting through the locals. We noted that, unlike the original union election, "the Secretary's supervision of the referendum establishes a presumption of fairness and regularity that is not upset by appellant's showing." *Id.* at

---

15. We recognize there is some post-*Trbovich* authority to the contrary. The Ninth Circuit has held that an incumbent officer who is defeated in the supervised rerun cannot intervene as party defendant to challenge the district court's approval of the Secretary's certification. *Brennan v. Silvergate Dist. Lodge No. 50, Machinists,* 503 F.2d 800 (9th Cir. 1974). While we disagree with this reading of *Trbovich, Silvergate* is distinguishable, as involving the distinct problem of intervention on the side of the union. The court there noted that the incumbent officer "has no legitimate interest in the lawsuit apart from those interests represented by the union as an entity i.e., to pre-

serve the fairness of the union's elections." *Id.* at 807.

The Third Circuit takes the opposing view, that the interests of the defeated incumbent are no longer represented by the defendant union, now headed by the former dissidents. "The practical effect of a rule denying intervention in such a case was to place the Secretary's certification in many cases beyond effective judicial review." *Hodgson v. Carpenters Resilient Flooring Local Union No. 2212, supra* note 11, 457 F.2d at 1369. *See also Brennan v. Local 551, United Auto Workers,* 486 F.2d 6, 8 (7th Cir. 1973).

54, 499 F.2d at 1059. The challenger of a supervised election carries a heavy burden of persuasion and proof to show that the Secretary's certification was arbitrary, capricious, or otherwise not in accordance with law. Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D).[16]

Appellants urge that the District Court erred in failing to hold an evidentiary hearing, and provide opportunity for discovery, before passing on the Secretary's certification, and in rendering what is in effect a summary judgment in the face of disputed issues of fact.[17] In its 1972 *Carpenters Resilient Flooring* decision, the Third Circuit suggested that an evidentiary hearing is required and that the summary judgment procedures of Fed.R.Civ.P. 56 apply.[18] While we have followed the Third Circuit's ruling in certain aspects (*see* text at note 9 *supra*) we decline to follow its view that an evidentiary hearing is required, both on principle and on the subsequent authority of *Dunlop v. Bachowski.*

In *Bachowski* the Supreme Court reversed a 1974 Third Circuit ruling permitting a challenge to the "factual basis" for the Secretary's conclusion that the statutory prerequisites for a section 402 suit were not met, and requiring the Secretary to supply "a sufficiently specific statement of the factors on which the Secretary relied in reaching his decision . . . so that [the union member complainant] may have information concerning the allegations con-

tained in his complaint." 502 F.2d 79, 89–90.

The *Bachowski* Court made clear that because the statutory scheme relies on the "special knowledge and discretion of the Secretary" as to the probable violation and probable effect determinations, "the reviewing court is not authorized to substitute its judgment." And although the Secretary must supply a statement of reasons, "[e]xcept in what must be the rare case, the court's review should be confined to examination of the reasons statement, and the determination whether the statement without more evinces that the Secretary's decision is so irrational as to constitute the decision arbitrary and capricious." 421 U.S. at 572–73, 95 S.Ct. at 1860. *Bachowski* thus delineates a scope of review "much narrower than applies under 5 U.S.C. § 706(2)(A) in most other administrative areas,"[19] and constrains the very mode of review.[20]

We recognize that at the remedial stage the court has a broader scope of decision than it does with respect to the Secretary's determination whether or not to bring the original suit. Nonetheless, considerations of "special knowledge and discretion" are applicable, particularly where the election is held under the Secretary's ongoing supervision and control. Indeed, because of the Secretary's oversight and familiarity, the rerun, if certified, enjoys a "presumption of fairness and regularity." Moreover, the statutory concern with expeditious resolution of post-election dis-

---

16. *See Brennan v. Local 551, United Auto Workers*, 486 F.2d 6, 8 (7th Cir. 1973); *Brennan v. Sindicato Empleados de Equipo Pesado*, 370 F.Supp. 872 (D.P.R.1974).

17. Appellants also raise the formal objection that summary judgment should not have been granted because the Secretary failed to file a statement of material facts as to which there was no issue, as required by the District Court's rules. We note that this point was not raised below, and that appellants themselves did not conform to the formalities of summary judgment, in failing to submit affidavits or other court-approved supplemental material in opposition to the Secretary's motion for entry of judgment. *See* Fed.R.Civ.P. 56(e).

18. *See* 457 F.2d at 1369–70.

19. *Dunlop v. Bachowski*, 421 U.S. at 590, 95 S.Ct. at 1868 (Burger, C. J., concurring).

20. Thus, review may not extend to cognizance or trial of a complaining member's challenges to the factual basis for the Secretary's conclusion . . . . . The full trappings of adversary trial type hearings would be defiant of congressional objectives not to permit individuals to block or delay post-election disputes, but rather "to settle as quickly as practicable the cloud on the incumbents' title to office"; and "to protect unions from frivolous litigation and unnecessary interference with their elections."

*Dunlop v. Bachowski*, 421 U.S. at 573, 95 S.Ct. at 1860.

putes is no less present at this stage, indicating the need for a foreshortened review process.

■ Of course, the Secretary's reasons for certification cannot rest on unsubstantiated conclusions, for "the statement of reasons should inform the court and the complaining union member both the grounds of decision and the essential facts upon which the Secretary's inferences are based." 421 U.S. at 573–74, 95 S.Ct. at 1861. And where the statement is facially insufficient, the court may require supplemental explanation from the Secretary. *Id.* at 574–75, 95 S.Ct. 1851.[21] However, where the Secretary's statement on its face indicates a rationally based decision the court's task is at an end, unless the challenger makes a specific factual proffer of irregularity, in which event the burden of persuasion shifts to the Secretary to provide further supplementation (the ultimate burden of proof resting with the challenger).

## D. *The Merits*

■ In their opposition to the Secretary's motion for entry of judgment, appellants raised eight separate protests, with the Secretary responding to each through the affidavit of J. Vernon Ballard, Director of the Office of Labor-Management and Welfare-Pension Reports. We consider here only the three protests that the Ballard affidavit indicated may have involved conduct violative of Title IV, although without probable effect on the outcome of the rerun contest. The reasons stated by the Secretary for dismissing the other five—essentially that the conduct in question involved bona-fide union business,[22] or that the Secretary's investigation failed to disclose probable violations[23]—are persuasive on their face, and appellants have made no showing that would require supplementation.

■ As to the conduct which the Secretary found to constitute probable violations, this court may properly insist on a careful statement of reasons for the conclusion of lack of probable effect on the outcome of the election.[24] However, we do not agree with appellants that a violation of section 401 makes out a prima facie case of probable impact on the outcome of an election. That is the rule for violations, not susceptible of quantification, which are committed in the course of an unsupervised election. *Wirtz v. Hotel Employees Local 6,* 391 U.S. 492, 505–09, 88 S.Ct. 743, 20 L.Ed.2d 763 (1968). "Here, however, the Secretary's supervision of the [rerun election] establishes a presumption of fairness and regularity that is not upset by appellant[s'] showing." *Brennan v. Int'l Union*

---

21. On remand from the Supreme Court in *Bachowski,* the district court ordered supplementation because the Secretary's initial statement of reasons employed an inconsistent methodology, crediting Bachowski with the whole infected vote for some alleged infractions but with only the margin of defeat for others. *Bachowski v. Brennan,* 405 F.Supp. 1227, 1234 (W.D. Pa.1975).

22. Protest No. 2 charged that incumbents' announcement during the rerun of an increase in health and welfare and pension benefits constituted an illegal distribution of campaign literature. Ballard's rather detailed answer explained that the increases were announced in the normal course of union business and the timing and manner of their announcement were justified by bona-fide considerations. *See* J.A. 35–38.

Protest No. 8 alleged that in the fall of 1973 the incumbents had stopped making unauthorized payments to 300-odd shop stewards in order to intimidate the stewards into supporting the incumbent slate. Ballard conceded that the union had told the stewards that extensive legal fees prevented continued payments, but "[t]he investigation did not support illegal or coerced use of shop stewards to support the incumbents' campaign." *See* J.A. 42–44.

23. Protest No. 3 (alleged incumbent use of union facilities to further campaign), *see* J.A. 38; Protest No. 4 (alleged discriminatory access to pre-addressed envelopes from Health and Welfare Fund and union printer), *see* J.A. 38; Protest No. 7 (election eve arrest of appellant George allegedly "arranged" by incumbent president in order to discredit the George candidacy), *see* J.A. 42.

24. *See Dunlop v. Bachowski,* 421 U.S. 560, 571–72, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *DeVito v. Shultz,* 300 F.Supp. 381, 383 (D.D.C. 1969).

*of Dist. 50,* 163 U.S.App.D.C. at 54, 499 F.2d at 1059.

 Protest No. 1 raises the defendant's failure to post notices of the rerun election and of the eligibility of intervenor-appellant Daniel George. The District Court had ordered posting to give notice of the forthcoming election to members for whom addresses could not be determined. The posting of George's eligibility was ordered to remedy defendant's prior unlawful disqualification of George from union membership.[25] Appellants note that the smallest margin of victory was 143 votes out of 6000-plus members, and lean on the Secretary's own findings that the union posted notice of the election at only 80 percent of the barns and terminals, and of George's revived eligibility at only 4 of 43 barns and terminals.

 Ballard's affidavit counters that the membership had actual notice of both the election and George's eligibility. As to the election notice, the affidavit states that the union complied with statutory requirements and the District Court's order. Ballard pointed out that posting was only a "back up method," and that substantially all members were personally notified by the union's mailing of section 401(e) notices and the employers' insertion, at the Secretary's request, of notices of the December 16 election in the December pay envelopes (J.A. 32–33). As to George's eligibility notice, Ballard assumed *arguendo* that the union's failure to post at 39 barns and terminals stated a violation, but found "no effect on the outcome" because of the considerable publicity attending the contest and the fact that the Government ultimately posted notices at all of the barns and terminals and personally handed out notices at the polling places. Of the 32 stewards and 69 rank-and-file members interviewed at random by Department of Labor personnel, half had seen the notices and *all* knew of George's eligibility (J.A. 33–35). Admittedly, it is conceivable that failure to post the eligibility notice well in advance of the balloting, coupled with defendant's previous effort to oust George from membership, may have worked in a "chilling effect" on voter turnout. But this is mere speculation in the absence of a showing by appellants of a significantly reduced turnout compared to previous elections. On the record as it stands, we credit the Secretary's judgment, based on expertise and investigation of the actual situation, that the election was "widely publicized."[26]

Protest No. 5 involved two claimed instances of employer assistance to the incumbents. The first occurred on December 14, 1973. Two days before the election, 54 union members attended a special meeting called by their employer, the Excavation Construction Company, at which the company general manager urged the assemblage to vote in the upcoming election and stated that the incumbents had done a good job for the membership. Beer and soda were served, and every employee attending received two hours of overtime pay. The second incident involved a loan by Bekins Mideast Van Line Truck Company of one of its vans free of charge for use by the incumbents. Appellants charge that since the smallest margin of victory was only 143 votes, the improper influence exerted on the 54 members and on those who saw the Bekins van being used by the incumbents, coupled with the probable communication of these incidents to other members, undoubtedly had a probable effect on the outcome of the rerun.

**25.** *See* note 7 *supra.*

Protest No. 6 also involved the reprisals taken against George, as well as the union's dismissal of Saul Macklin, another dissident candidate, from his position as shop steward. The Ballard affidavit states that the attempted reprisals were unsuccessful, as both George and Macklin were reinstated by orders of the District Court, and the investigation indicated that the action against Macklin was not connected with the rerun election and did not disclose that any member was dissuaded by fear of similar reprisals from supporting the dissident slate. *See* J.A. 41–42.

**26.** *See Brennan v. Int'l Union of Dist. 50, Allied & Techn. Workers,* 163 U.S.App.D.C. 46, 53–54, 499 F.2d 1051, 1058–59 (1974).

The Ballard affidavit concedes that as to the December 14 meeting the expenditures of money and use of employer facilities to support the incumbents' campaign violated section 401(g), but argues that given the margin of victory there was no probable effect on the outcome. (J.A. 39–40). As to the Bekins van loan, the affidavit states that this was at most a "technical violation" since there was bona-fide confusion over whether it was a loan or rental and voters noticing incumbents' use of the van would not have known it was a loan rather than a rental (J.A. 39–40).

The occurrence of employer assistance to incumbents in the course of a government-supervised election is indeed troubling, but we cannot say that the Secretary acted without rational basis in concluding there was no probable effect on the outcome. The margin of victory remains even if all 54 in attendance at the December 16 meeting are credited as would-be voters for the dissident slate. The Bekins van incident is ambiguous in effect. Appellants speculate that knowledge of employer endorsement of the incumbent slate must surely have spread throughout the local in time to taint the results. We note that the meeting was held on the Friday before the Sunday election, a period which perhaps does not admit of significant intralocal communication. In any event, while this conduct was undoubtedly violative of Title IV, the assessment of its probable effect is vested by statute in the sound discretion of the Secretary. We think the Ballard affidavit suffices to establish the Secretary's decision as reasonable, at least in the absence of a proffer of proof by appellants that knowledge of these incidents was either widespread or in fact swayed votes away from the dissident slate.

## III. THE ORDER DENYING ATTORNEY'S FEES, COSTS AND SUIT MONEY

The issue of whether a federal court has the power to award attorney's fees on a "common benefit" rationale [27] to an intervenor-plaintiff in a suit brought by the Secretary of Labor under section 402 of LMRDA is apparently one of first impression on the appellate level.[28] Since the District Court denied intervenor-plaintiffs' motion without opinion, we do not know whether the basis of its ruling was lack of authority to award attorney's fees or absence of benefit to the union membership. Appellee Local 639 objected below on both grounds. The Secretary of Labor takes no position on these matters.

### A. The "Common Benefit" Rationale

As the Supreme Court recently noted in *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 257–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the "American Rule" —the principle, embodied in an 1853 statute and now codified as 28 U.S.C. §§ 1920, 1923(a), which bars in the absence of statutory authorization the award of attorneys fees to the prevailing party in federal litigation—is subject to a longstanding exception in the "common benefit" rationale. The *Alyeska* Court recognized that "[i]n *Trustees v. Greenough*, 105 U.S. 527 [26 L.Ed. 1157] (1882), the 1853 Act was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. That rule has

---

27. In their reply brief (p. 16), appellants assert for the first time an additional theory for granting attorney's fees predicated on the "bad faith and oppressive litigation practices" of appellee Local 639. This matter was not presented below, and we decline to consider whether the facts here would support a "bad faith" award.

28. One district court has rejected the claim, *Brennan v. United Steel Workers (District 31)*, Civil Action No. 73–957 (W.D.Pa. Dec. 11, 1975), while another had no occasion to decide what it regarded as an "open question" because of insufficient "common benefit," *Brennan v. Connecticut State UAW Community Action Program Council*, No. B–743, 74 CCH Lab. Cas. ¶ 10,294 (D.Conn. Apr. 24, 1974).

been consistently followed." *Id.* at 257–58, 95 S.Ct. at 1621.

This "historic power of equity," essentially an application of the court's power when seized of jurisdiction over a case to award complete relief so as to prevent unjust enrichment, has developed well beyond the "common fund" limitation of *Greenough.* In *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), the Court recognized power in the district court to reimburse a plaintiff's litigation expenses even though she sued for her own benefit and not for a class, because her success would by operation of stare decisis entitle others to recover out of the same assets. There is no prerequisite of pecuniary benefit, as was made clear by *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 392–94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), a case involving a judicially implied right of action under the Securities Exchange Act of 1934 to challenge materially false or misleading proxy solicitation.[29] *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), extends *Mills* to an express statutory cause of action.

This development remains undisturbed after *Alyeska* because the "common bene-

fit" rational was not involved in that case,[30] and the Court made clear that "Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorney fees." 421 U.S. at 259–60, 95 S.Ct. at 1623. *See also F. D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 129–30 & n. 18, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).[31]

With respect to LMRDA, the courts have uniformly applied a "common benefit" analysis to award attorney's fees to private litigants. The Supreme Court in *Hall v. Cole, supra,* endorsing earlier decisions of the Third Circuit [32] and this court,[33] held that attorney's fees may be awarded for suits brought to enforce the "Bill of Rights" guarantees of Title I of LMRDA. This court's decision permitted the recovery of attorney's fees for a suit under Title V, which places union officials under federally defined fiduciary obligations. *Bakery & Confectionery Workers Int'l Union v. Ratner,* 118 U.S.App.D.C. 269, 335 F.2d 691 (1964).[34] *Ratner* was extended by this court to a suit brought under section 401(c), the only privately enforceable provision in Title IV. *Yablonski v. United Mine Workers,* 151 U.S.App.D.C. 253, 466 F.2d 424 (1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2729, 37

---

**29.** *Mills* permits "depart[ures] further from the traditional metes and bounds of the [common fund] doctrine" where "litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs among them." 396 U.S. at 393–94, 90 S.Ct. at 626.

**30.** *See* 421 U.S. at 245, 259–60, 95 S.Ct. 1612, noting that this court's decision in *Alyeska* disclaimed reliance on the traditional equitable exceptions of "common benefit" and "bad faith." *Wilderness Society v. Morton,* 161 U.S. App.D.C. 446, 449, 495 F.2d 1026, 1029 (en banc, 1974).

**31.** For examples of post-*Alyeska* "common benefit" decisions, *see National Treasury Employees v. Nixon,* 172 U.S.App.D.C. 217, 521 F.2d 317 (1975) (mandamus action to require the President to grant pay adjustments required by statute); *Swanson v. American Consumer Indus., Inc.,* 517 F.2d 555 (7th Cir. 1975) (stockholder derivative suit and class action); *Harrison v. United Transp. Union,* 530 F.2d 558

(4th Cir. 1975) (suit by railroad conductor against union for breach of duty of fair representation).

**32.** *Gartner v. Soloner,* 384 F.2d 348 (3d Cir. 1967), *cert. denied,* 390 U.S. 1040, 88 S.Ct. 1633, 20 L.Ed.2d 302 (1968).

**33.** *Bakery & Confectionery Workers Int'l Union v. Ratner,* 118 U.S.App.D.C. 269, 335 F.2d 691 (1964); *Yablonski v. United Mine Workers,* 151 U.S.App.D.C. 253, 466 F.2d 424 (1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973).

**34.** Although section 501(b), 29 U.S.C. § 501(b), provides for allotting "a reasonable part of the recovery" for attorney's fees, the courts have uniformly followed this court's *Ratner* decision in awarding fees in cases of "substantial benefit" to the union even though there is no money recovery. 118 U.S.App.D.C. at 274–75, 335 F.2d at 696–97. *See* Note, *The Fiduciary Duty Under Section 501 of the LMRDA,* 75 Colum.L. Rev. 1189, 1204 n. 96 (1975) & cases cited therein.

L.Ed.2d 144 (1973).[35] And, recently, the Fifth Circuit applied the reasoning of these decisions to a suit brought under Title III, which regulates union trusteeships, a provision enforceable by either the Secretary or union members directly. *McDonald v. Oliver*, 525 F.2d 1217 (5th Cir. 1976).

Significantly, in none of these decisions was there a statutory provision that expressly authorized the award made.[36] Rather, the governing rationale was that union members by bringing suits against their union help vindicate the statutory policy in favor of union democracy which necessarily redounds to the benefit of the entire membership. The statute is expressly aimed at protecting union members from the corruption and electoral unresponsiveness of their leadership. "Fee-shifting" is particularly appropriate because of the close match between the party assessed and the beneficiary of the litigation. Indeed, the benefited class, its contours shaped by the union's self-description and its finances based on per capita payments, fits the paradigm for "common benefit" cases. "In [the Supreme] Court's common-fund and common-benefit decisions, the classes of beneficiaries were small in number and easily identifiable. The benefits could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefiting." *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. at 265 n. 39, 95 S.Ct. at 1625.

■ The issue here is whether the "common benefit" rationale may be applied to the case of union member intervention in a suit brought by the Secretary to enforce electoral rights and maintain the integrity of a union election. The appropriateness of "fee-shifting" in the union democracy context suggests an affirmative answer, unless

Congress can be said to have evidenced a purpose to bar the award of such fees. "[E]ven where 'fee-shifting' would be appropriate as a matter of equity, Congress has the power to circumscribe such relief." *Hall v. Cole*, 412 U.S. at 9, 93 S.Ct. at 1948.

## B. *Issue of Statutory Preclusion*

### (1) *Administrative Enforcement*

■ At the outset, it is our view that the mere fact that primary enforcement responsibility for Title IV rests with the Secretary of Labor, rather than private litigants, does not establish congressional preclusion of "the traditional equitable power of federal courts to award such fees whenever 'overriding considerations indicate the need for such a recovery.'" *Hall v. Cole*, 412 U.S. at 9, 93 S.Ct. at 1948. It is pertinent that the Secretary started the motor that launched a section 401 suit, and this may have bearing on the amount of fees recoverable.[37] But it does not negate the possibility of recognition of benefit from the contribution of individual union members, as complainants and *Trbovich* intervenors, to the success and direction of the litigation journey. Their contribution may yield a substantial, and properly compensable, benefit to the membership exceeding that derived from the Secretary's efforts.

*Trbovich* recognized a right of intervention limited to the claims of illegality presented by the Secretary's complaint. The Court justified intervention on the ground that "the union member may have a valid complaint about the performance of 'his lawyer.'" since the Secretary's obligation to advance the public interest may not always dovetail with his other responsibility to represent the complainant's interest. 404 U.S. at 539, 92 S.Ct. at 636. However, neither the limitations on the intervenor's role nor the stated justification for inter-

---

**35.** Plaintiff Yablonski's "Fair Election Case" made express reference to sections 401(c), (e), 501 of LMRDA. However, the court made clear that section 501 was not "the primary statutory foundation" of the suit, 151 U.S.App.D.C. at 257 n. 5, 466 F.2d at 428 n. 5, and section 401(e) could not have been the subject of a pre-election action, *Calhoon v. Harvey*, 379

U.S. 134 (1964). *See* Note, *Pre-Election Remedies Under the Landrum-Griffin Act, supra* note 4, 74 Colum.L.Rev. at 1115 & n. 61.

**36.** As to this court's *Ratner* decision, *see* note 34 *supra*.

**37.** *See* discussion in part IV *infra*.

vention necessitate the conclusion as a matter of law that no substantial benefit can ever be rendered to the union membership.[38]

It is not difficult to conceive of examples of material assistance to the Secretary and the court in the vindication of the interest—of the public and the union rank and file—in union democracy.[39] At trial counsel representing the intervenor may unearth material and even elusive evidence, or develop telling arguments in support of the Secretary's claims of illegality. As we note above, the *Trbovich* Court envisioned that intervenors would perform a role independent of the Secretary in helping the court fashion a suitable remedial order, and perhaps even assist the Secretary in supervising the conduct of the rerun.[40] And in this decision we accord to *Trbovich* intervenors

full party status to challenge the Secretary's certification. The particular challenge here was unavailing, but sound principle advises that error is more likely to be exposed when intervenors are able to secure competent counsel because of the prospect of recovering attorney's fees.

 Apart from the *Trbovich* intervention context, the private efforts of union members may precipitate successful Department of Labor intervention.[41] A union member seeking review under the *Bachowski* ruling of the Secretary's failure to bring suit may expose irrationality and succeed in changing the Secretary's mind and course of events, culminating in a successful section 402 litigation. Perhaps even more important is skillful lawyering at the initial stages of the enforcement scheme, *e. g.*,

**38.** Although to satisfy the requirement of Fed. R.Civ.P. 24(a)(2) the Court in *Trbovich* hypothesized that the Secretary may not adequately represent the complainant's partisan concerns, its primary focus was on the likelihood that such intervention would "assist the Secretary" and the court in vindicating the statutory mandate, *see* 404 U.S. at 536–37 & n. 8, 92 S.Ct. 630. As this court stated in *Yablonski v. United Mine Workers*, 151 U.S.App.D.C. 253, 259–60, 466 F.2d 424, 430–31 (1972), *cert. denied*, 412 U.S. 918,, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973), *cited with approval in Hall v. Cole*, 412 U.S. 1, 14, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), "[i]t is obvious in virtually all litigation of this character, in the labor field or out, a plaintiff pursues his own interest as well as that of others. The relevant question in whether or not the trouble he takes results in the actual conferring of benefits on others than himself." *See also* Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv.L.Rev. 721, 746 (1968): "But the very fact that the intervenor—from the vantage point of his own interest—sees the case with a perspective and perhaps an intensity different from that of the agency charged with the protection of the public as a whole may indicate that he can in fact contribute to the court's total understanding."

**39.** Since this case involved a successful section 402 action culminating in a supervised rerun election, we do not decide whether attorney's fees may be awarded where there has been no adjudicated violation because the parties have negotiated a consensual disposition. We note, however, that ultimate success has not been required in other contexts. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396, 90 S.Ct. 616,

24 L.Ed.2d 593 (1970); *Yablonski v. United Mine Workers*, 151 U.S.App.D.C. 253, 260, 466 F.2d 424, 431 (1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973).

**40.** Complainant participation at the remedial stage of the *Trbovich* suit led the Secretary to depart from his traditional policy of minimal supervision of court-ordered reruns in the 1972 restaging of the 1969 United Mine Workers election. *Compare* the Secretary's usual practice, *discussed in* Note, *Union Elections and the LMRDA, supra* note 4, 81 Yale L.J. at 519–27, *with Hodgson v. United Mine Workers*, 344 F.Supp. 17, 35–37 (D.D.C.1972).

**41.** Although the rights of *Trbovich* intervenors are a derivative of the Secretary's authority, we do not agree that this bars an award for fees incurred prior to the Secretary's filing of a section 402 action. Whether or not the Government may intervene under Title IV prior to this point, *see* 29 U.S.C. § 521(a) (pre-complaint investigation), the court has power to grant complete relief according to the necessities of the case.

We also reject appellee Local 639's claim, based on 28 U.S.C. § 2412, that since the Secretary cannot recover attorney's fees intervenors cannot stand in any better position. This court has previously held that this statute does not bar a "common benefit" award assessable against private parties where there is no retroactive impact on the public treasury, *National Treasury Employees v. Nixon*, 172 U.S.App. D.C. 217, 219–20, 521 F.2d 317, 319–20 (1975). We see no reason to create a special rule for *Trbovich* intervenors.

assisting union members in identifying infractions in elections, formulating a bill of particulars, supervising the exhaustion of internal remedies, and drafting a complaint for presentation to the Secretary. Such efforts benefit the membership of the union by ensuring that all the defects in the election are properly preserved for government intervention. Indeed, they are an essential predicate to government intervention. The Secretary cannot seek to set aside a union election on grounds which were not raised in "some discernible fashion" by the complainant during exhaustion, *Hodgson v. Local 6799, Steel Workers*, 403 U.S. 333, 340–41, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971), or which "the union [did not have] a fair opportunity to consider and redress in connection with a member's initial complaint." *Wirtz v. Local 125, Laborers*, 389 U.S. 477, 484, 88 S.Ct. 639, 643, 19 L.Ed.2d 716 (1968).[42]

That private interests may aid in the vindication of statutory policy notwithstanding the stewardship of an administrative agency is hardly a novel concept. It finds resonance in the cases recognizing standing in competitors and rights of intervention in private groups to act as "private attorneys general" in agency proceedings and court review of agency action.[43] In numerous statutes Congress has authorized attorney's fees for private litigants while providing an alternative of government enforcement.[44] And the courts have permitted recovery of attorney's fees under the "common benefit" rationale even though government action was available to enforce the statutory policy. This was the case in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), where the Securities and Exchange Commission could have enforced the provision in question,[45] and in the recent Fifth Circuit decision in *McDonald v. Oliver*, 525 F.2d 1217, 1228 (5th Cir. 1976), where a contemporaneous suit by the Secretary of Labor under Title III had been consolidated with the private action.

The exclusivity of the administrative remedy for Title IV, and the underlying congressional intent to shield unions from private suits and undue governmental intervention, means that *Mills* and the LMRDA precedents are not on all fours, but the distinction does not call for a different view of the court's power to make a "common benefit" award. As the Secretary's determination to take no position on this issue suggests, allowance of attorney's fees for union member efforts in aid of the Secretary's action does not undercut the exclusivity of the administrative remedy. "Congress, although committed to minimal intervention, was obviously equally committed to making that intervention, once warrant-

42. Of course, union members are not held to a standard of legal precision in framing their internal protests, and the union carries a "heavy burden" to show it was not put on notice, *Hodgson v. Local 6799, Steel Workers*, 403 U.S. 333, 340–41, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971). But the *Hodgson* case itself illustrates the perils of uncounseled exhaustion of internal union remedies, for the union member's failure to object to a meeting attendance rule barred the Secretary from challenging the rule in a section 402 action.

43. *See, e. g., Associated Industries v. Ickes*, 134 F.2d 694, 704 (2d Cir.), *vacated as moot*, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943); *Office of Church of Christ v. FCC*, 123 U.S. App.D.C. 328, 359 F.2d 994 (1966). *See generally* Gellhorn, *Public Participation in Administrative Proceedings*, 81 Yale L.J. 359 (1972); Note, *Federal Agency Assistance to Impecunious Intervenors*, 88 Harv.L.Rev. 1815 (1975).

44. *See* statutes cited in *McDonald v. Oliver*, 525 F.2d 1217, 1228 (5th Cir. 1976).

45. The Supreme Court considers private enforcement of the proxy rules to be "a necessary supplement to Commission action" because of limited Commission enforcement resources. *J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 382, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). While "the limited resources of the Secretary of Labor," *Hodgson v. Local 6799, Steel Workers*, 403 U.S. 333, 339, 91 S.Ct. 1841, 1845, 29 L.Ed.2d 510 (1971), are not of a dimension to warrant implication of a private right of action, the assistance of intervenor's counsel may nonetheless provide a welcome supplement to the efforts of a beleaguered enforcement staff.

ed, effective in carrying out the basic aim of Title IV." *Wirtz v. Local 153, Glass Bottle Blowers,* 389 U.S. 463, 473, 88 S.Ct. 643, 649, 19 L.Ed.2d 705 (1968).

### (2) *Comprehensiveness of Remedial Scheme*

 Appellee Local 639 contends that Title IV embodies an "explicit, comprehensive and exclusive remedial scheme" such as was found in *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), to bar recovery of attorney's fees in a trademark infringement action under the Lanham Act. We reject the analogy to *Fleischmann.*

Although *Fleischmann* has been repeatedly cited as an example of statutory preclusion of attorney's fees, the case itself did not present an occasion for invocation of the "common benefit" rationale,[46] and essentially anticipates *Alyeska's* affirmance of the "American Rule" in cases falling outside the metes and bounds of the traditional equitable exceptions. Insofar as *Fleischmann* stands for a broad principle against judicial implication of remedies in the context of statutory causes of action, *see* 386 U.S. at 719–20, 87 S.Ct. 1404, it is of doubtful viability in light of subsequent decisions.[47] Whereas the Court in *Fleischmann* was willing to find preclusion in Congress' selective provision of attorney's fees in other statutes and unsuccessful efforts to enact a similar measure into the Lanham Act, *id.* at 720–21, 87 S.Ct. 1404, the Court in *Mills* and *Hall* employed a presumption *against* preclusion, permitting "common benefit" awards in the context of statutory causes of action notwithstanding provision for attorney's fees in other sections of the *same* statute. *Mills,* 396 U.S. at 390–91, 90

S.Ct. 616; *Hall,* 412 U.S. at 10–11, 93 S.Ct. 1943.

What remains of *Fleischmann* after *Mills* and *Hall* is the rather strict test enunciated in *Hall,* that preclusion will not be found unless the remedies available have been " 'meticulously detailed,' " 412 U.S. at 9, 93 S.Ct. 1943, or there has been " 'a definitive and absolute setting of the Congressional face against the giving of such incidental relief by the courts where compatible with sound and established equitable principles,' " *id.* at 12, 93 S.Ct. at 1950. *Fleischmann* was such a case because the remedial provision of the Lanham Act specifically "provided not only for injunctive relief, but also for compensatory recovery measured by the profits that accrued to the defendant by virtue of his infringement, the costs of the action, and damages which may be trebled in appropriate circumstances." *Fleischmann,* 386 U.S. at 719, 87 S.Ct. at 1408. This precise specification of remedies thus encompassed "an authority which could, as a practical matter, be used to mitigate the burden of counsel fees," *Yablonski v. United Mine Workers, supra,* 151 U.S.App.D.C. at 258, 466 F.2d at 429, and presented a compelling case against further judicial relief.

To bring this case within *Fleischmann,* appellee Local 639 cites to the specific rejection by Congress of the bill that passed the House, H.R. 8342, which provided for union member suit and authorized the court to grant such relief "as may be appropriate," including attorney's fees.[48] Appellee argues that this legislative history, coupled with the specification of remedies in section 402(b), evidences a congressional purpose to curtail the court's inherent equitable jurisdiction.

---

**46.** *See Fleischmann,* 386 U.S. at 720, 87 S.Ct. at 1408 ("But none of the considerations which supported the exception recognized in *Sprague [v. Ticonic Nat'l Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939),]* are present here"); *Yablonski v. United Mine Workers,* 151 U.S. App.D.C. 253, 258, 466 F.2d 424, 429 (1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973).

**47.** *See* Comment, *The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co.,* 38 U.Chi.L.Rev. 316, 321–25 (1971).

**48.** H.R. 8342, 86th Cong., 1st Sess. § 402(a) (1959). *See also* S. 748, 86th Cong., 1st Sess. §§ 302(d), 405–06 (1959), the Administration's bill, introduced by Senator Goldwater, which provided for both administrative and private enforcement.

We have taken into consideration that the enforcement scheme for Title IV is set out with greater detail than the more flexible provisions involved in previous LMRDA "common benefit" decisions,[49] and that Congress rejected a private enforcement scheme which would have provided for attorney's fees. But our inquiry cannot rest with this comparison.[50] The *Trbovich* Court's review of the legislative history makes clear that the debate in the Congress was over the respective merits of union member suits as opposed to enforcement actions by the Secretary of Labor. 404 U.S. at 532–36, 92 S.Ct. 630. The Conference Committee and the House ultimately adopted the public enforcement scheme of the Kennedy-Ervin bill, S. 1555, presumably because they agreed with the Senate that the Secretary should screen frivolous complaints and consolidate meritorious ones.[51] This legislative history, as *Trbovich* holds, "can in no sense be read as a rejection of all forms of private participation in enforcement litigation," because Congress never focused on "the possibility that union members might assist the Secretary rather than displace him." *Id.* at 536, 92 S.Ct. at 635. Similarly, while Congress adopted a particular mode of enforcement, it failed to address with any detail the scope of relief, or what the court's role would be at the remedial stage.[52]

Far from the "meticulously detailed" remedial provision involved in *Fleischmann,* the courts have had to fill out the details of the Title IV enforcement scheme. The *Trbovich* decision permitting union member intervention is a case in point.[53] No provision for settlements is made in the statute, and indeed the mandatory language and 60-day limitation period of section 402 suggest a design to preclude disposition short of suit. Nonetheless, the Supreme Court has stressed the Secretary's ameliorative function as an important feature of the statutory scheme,[54] and the courts have read into the statute a "waiver" procedure to afford time to negotiate settlements [55]

---

**49.** *Compare* 29 U.S.C. § 482(b), (c), *with id.* §§ 412 (Title I), 440 (Title II), 464(a) (Title III), 501(b) (Title V). The one exception to this pattern is section 401(c), *id.* § 481(c), which simply establishes a union duty, enforceable by private suit, to provide equal treatment in the distribution of campaign literature and access to membership lists.

**50.** As the Supreme Court has counseled in other LMRDA cases, repeating the advice of Professor Archibald Cox who was a principal consultant to the draftsmen, " 'because much of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises . . . ., the courts would be well advised to seek out the underlying rationale without placing great emphasis on close construction of the words.' " *Wirtz v. Local 153, Glass Bottle Blowers,* 389 U.S. 463, 468 & n. 6, 88 S.Ct. 643, 646, 19 L.Ed.2d 705 (1968); *Hall v. Cole,* 412 U.S. 1, 11 n. 17, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1972), *quoting* Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959,* 58 Mich.L.Rev. 819, 852 (1960).

**51.** The Conference Report simply states that the Senate bill's administrative enforcement scheme prevailed over the House bill's private suit provision, without tendering any explanation for the outcome. H.R. Rep. No. 1147, 86th Cong., 1st Sess. 35 (1959), U.S.Code Cong. & Admin.News, 1959, p. 2318.

**52.** *See,* Beaird, *Union Officer Election Provisions of the Labor-Management Reporting and Disclosure Act of 1959,* 51 Va.L.Rev. 1306, 1339 (1965). *Contra,* Note, *The Election Labyrinth: An Inquiry into Title IV of the LMRDA,* 43 N.Y.U.L.Rev. 336, 358 (1968).

The Senate Committee report offers the only guidance, and little at that. "After the election the Secretary would certify the names of the persons elected and enter *an appropriate decree* declaring them to be the officers of the labor organization." S.Rep. No. 187, 86th Cong., 1st Sess. 21 (1959) U.S.Code Cong. & Admin.News 1959, p. 2338 (emphasis supplied.)

**53.** *See also Wirtz v. Local 153, Glass Bottle Blowers,* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968) (supervening unsupervised union election does not render moot section 402 action).

**54.** *See Calhoon v. Harvey,* 379 U.S. 134, 140–41, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964).

**55.** *See Hodgson v. Machinists Lodge 851,* 454 F.2d 545 (7th Cir. 1971); *Hodgson v. International Pressmen,* 440 F.2d 1113 (6th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971). The courts have also implied a "waiver" where union conduct impedes the Secretary's investigation. *See, e. g., Wirtz v. Carpenters Local 1622,* 285 F.Supp. 455 (N.D.Cal. 1968).

and have reviewed the resulting dispositions for conformance with the Act. At the remedial stage, the courts have passed judgment on the timing, scope and procedures of the supervised election, performing the oversight role envisioned by the Court in *Trbovich*.[56] And during the course of the supervised election, the courts by express invocation of the "historic power of equity" have issued a broad range of ancillary relief to ensure the integrity of the contest.[57] Similarly, in reviewing the Secretary's certification of the rerun results, the courts have issued injunctive relief to cure recurring illegality.[58]

Thus, notwithstanding the absence of a broad relief provision in section 402, the court in a Title IV action faces the same task as if it were adjudicating a union member suit under the other titles—to grant relief according to the necessities of the case, *i. e.*, to fashion "appropriate" relief. The efforts of union member intervenors may be of considerable assistance to the court and the Secretary, warranting assessment against the party ultimately benefitted—the union membership. There was no need for judicially created compensation of private efforts in aid of the statutory objective in *Fleischmann*. Here we do not have a statute which "in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity," [59] preventing it from acting "cognizant of the historic power of equity to provide complete relief in light of statutory purposes." [60]

## IV. ON REMAND

 We affirm the District Court's judgment approving the Secretary's certification of the results of the December 16, 1973 supervised election, but reverse and remand the case on the attorney's fees issue. Whether an award is warranted in the case of appellants' counsel, and if so in what amount, is a matter for initial determination by the District Court in the sound exercise of its discretion.

The standards for determining the reasonable value of a lawyer's services have been developed in previous decisions of this court and need not be repeated here.[61] On the remand, the District Court will apply those principles in the context of this opinion authorizing a "common benefit" award when the Secretary has instituted a successful action under Title IV. Since the action is one to contest the initial January, 1972 election, the starting point must be services rendered after that election. Those services that were rendered after the action was filed will be matters the court can readily take into account. There may also have

56. *See, e. g., Brennan v. Local 551, United Auto Workers,* 486 F.2d 6 (7th Cir. 1973) (Secretary may delay date for supervised election); *Hodgson v. Local 1299, United Steel Workers,* 453 F.2d 565 (6th Cir. 1971) (Secretary may supervise entire rerun election, if necessary, even though original violation pertained only to changing of ballots between initial vote and recount); *Hodgson v. Chain Service Rest. L. & S. F. Emp. U. Local 11,* 355 F.Supp. 180 (S.D.N.Y.1973) (Secretary has authority to refuse to certify a candidate elected in supervised election but subsequently found to be ineligible because of Taft-Hartley Act conviction).

57. *See, e. g., Hodgson v. Int'l Union of Electrical Workers Local 485,* 503 F.2d 219, 223–24 (2d Cir. 1974) (court's "inherent equitable power" to require incumbent business agents to resign 30 days prior to supervised election); *Brennan v. Sindicato Empleados de Equipo Pesado,* 370 F.Supp. 872 (D.P.R.1974) (order declaring supervised election null and void and enjoining incumbents from continuing acts of

improper interference with union member rights and the Secretary's supervision); *Wirtz v. Independent Workers Union of Fla.,* 272 F.Supp. 31, 33–34 (M.D.Fla.1967) (court "sits as a court of equity" and can enjoin use of union funds to promote candidacy in court-ordered election).

58. *See, e. g., Brennan v. Sindicato Empleados de Equipo Pesado,* 370 F.Supp. 872 (D.P.R. 1974).

59. *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946).

60. *Mitchell v. Robert De Mario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960).

61. *See National Treasury Employees Union v. Nixon,* 172 U.S.App.D.C. 217, 222–23, 521 F.2d 317, 322–23 (1975); *Pete v. UMWAWRF,* 171 U.S.App.D.C. 1, 16, 517 F.2d 1275, 1290 (1975)

been services rendered prior to the filing of the action that were of benefit to the Secretary in his presentation of the cause; these are matters on which the Secretary's views would be material. The benefits conferred on the membership include those resulting from post-election services rendered during the exhaustion of internal union remedies, for these may have preserved grounds of protest that permitted and aided the ultimate intervention by the Secretary, to the benefit of the membership, and may even more immediately have inured to the benefit of membership through significant corrective action taken by the union.[62] On these matters, the discretion of the District Court, aided by the views of the Secretary, will permit a sound appraisal of benefits, and it is for that objective that the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

## APPENDIX

TITLE IV—ELECTIONS

Terms of Office; Election Procedures (29 U.S.C. § 481)

Sec. 401. (a) Every national or international labor organization, except a federation of national or international labor organizations, shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot.

(b) Every local labor organization shall elect its officers not less often than once every three years by secret ballot among the members in good standing.

(c) Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which

such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

(d) Officers of intermediate bodies, such as general committees, system boards, joint boards, or joint councils, shall be elected not less often than once every four years by secret ballot among the members in good standing or by labor organization officers representative of such members who have been elected by secret ballot.

(e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to

---

**62.** As appellants' brief notes (p. 38), affidavit of counsel did not itemize services rendered in prosecuting the present appeal. If appellants enlarge their motion to include a claim for these services, this also would be a matter for initial determination by the District Court.

be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote. No member whose dues have been upheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title.

(f) When officers are chosen by a convention of delegates elected by secret ballot, the convention shall be conducted in accordance with the constitution and bylaws of the labor organization insofar as they are not inconsistent with the provisions of this title. The officials designated in the constitution and bylaws or the secretary, if no other is designated, shall preserve for one year the credentials of the delegates and all minutes and other records of the convention pertaining to the election of officers.

(g) No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

(h) If the Secretary, upon application of any member of a local labor organization, finds after hearing in accordance with the Administrative Procedure Act that the constitution and bylaws of such labor organization do not provide an adequate procedure for the removal of an elected officer guilty of serious misconduct, such officer may be removed, for cause shown and after notice and hearing, by the members in good standing voting in a secret ballot conducted by the officers of such labor organization in accordance with its constitution and bylaws insofar as they are not inconsistent with the provisions of this title.

(i) The Secretary shall promulgate rules and regulations prescribing minimum standards and procedures for determining the adequacy of the removal procedures to which reference is made in subsection (h).

Enforcement

(29 U.S.C. § 482)

Sec. 402. (a) A member of a labor organization—

(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or

(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,

may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 401 (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

(b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this title has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this title and such rules and regulations as the Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization,

(c) If, upon a preponderance of the evidence after a trial upon the merits, the court finds—

(1) that an election has not been held within the time prescribed by section 401, or

(2) that the violation of section 401 may have affected the outcome of an election,

the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and by-laws of the labor organization. The Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization. If the proceeding is for the removal of officers pursuant to subsection (h) of section 401, the Secretary shall certify the results of the vote and the court shall enter a decree declaring whether such persons have been removed as officers of the labor organization.

(d) An order directing an election, dismissing a complaint, or designating elected officers of a labor organization shall be appealable in the same manner as the final judgment in a civil action, but an order directing an election shall not be stayed pending appeal.

## Application of Other Laws

(29 U.S.C. § 483)

Sec. 403. No labor organization shall be required by law to conduct elections of officers with greater frequency or in a different form or manner than is required by its own constitution or bylaws, except as otherwise provided by this title. Existing rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this title. The remedy provided by this title for challenging an election already conducted shall be exclusive.

## Effective Date

(29 U.S.C. § 484)

Sec. 404. The provisions of this title shall become applicable—

(1) ninety days after the date of enactment of this Act in the case of a labor organization whose constitution and by-laws can lawfully be modified or amended by action of its constitutional officers or governing body, or

(2) where such modification can only be made by a constitutional convention of the labor organization, not later than the next constitutional convention of such labor organization after the date of enactment of this Act, or one year after such date, whichever is sooner. If no such convention is held within such one-year period, the executive board or similar governing body empowered to act for such labor organization between conventions is empowered to make such interim constitutional changes as are necessary to carry out the provisions of this title.