Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

SINDICATO EMPLEADOS de EQUIPO PESADO, CONSTRUCCION Y RAMAS ANEXAS de PUERTO RICO, INC., Defendant.

Civ. No. 344–71.

United States District Court, D. Puerto Rico.

Jan. 10, 1974.

874

Ignacio Rivera-Cordero, Asst. U. S. Atty., San Juan, P. R., for plaintiff.

Demetrio Fernandez, Rio Piedras, P. R., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CANCIO, Chief Judge.

This cause came on to be heard upon the motion of the Secretary of Labor, United States Department of Labor, filed on April 23, 1973, for entry of an order directing the nominations and election of officers for the defendant union conducted under the supervision of the Secretary of Labor on November 26, 1972, be declared null and void, directing that a new election of officers be conducted under the supervision of the Secretary of Labor, and praying that the defendant union and its officers be enjoined and restrained from any violations of section 401(g) of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 481(g)), pending the completion of such new election; and similarly that defendant union and its officer be enjoined and restrained from improper interference or reprisal against any member for exercising rights under Title IV of the Act and further interfering with representatives of the Secretary of Labor in the supervision of the election. The trial on the issues raised by said motion was duly held on May 17, 1973, and August 23, 1973.

The Court, upon consideration of the pleadings, evidence and post-trial memoranda submitted by counsel, and the entire record in the case, makes the following findings of fact and conclusions of law:

### Findings of Fact

1. On May 13, 1971, plaintiff filed a complaint alleging failure of defendant union to conduct an election of officers

not less often than once every three years by secret ballot among its members in good standing in violation of section 401(b) of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 481(b)).

2. On May 31, 1972, the parties signed a stipulation agreeing that there would be nominations and election of all officers of the defendant union not later than November 30, 1972, and that the Secretary of Labor would supervise the conduct of the nominations and election proceedings. An order was entered by the Court on June 8, 1972, directing the conduct of the election pursuant to the terms of the stipulation, and election to be conducted under the supervision of the Secretary, ". . . in accordance with the provisions of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 401 et seq.), and, insofar as lawful and practicable, in conformity with the Constitution and By-Laws of defendant . ."

3. Mr. George E. Frank, Area Director of the Labor-Management Services Administration, Santurce, Puerto Rico, was appointed as supervisor by the United States Department of Labor. He scheduled a pre-nomination election conference held on October 10, 1972, attended by some members of the Board of Directors of defendant union, counsel for the defendant union, and other union members and candidates for office. The scheduling and procedures for the supervised nominations and election were discussed by the participants at that meeting.

4. Agreements reached at the pre-nomination election meeting on October 10, 1972, were confirmed by letter dated October 20, 1972, by Mr. Frank, addressed to members of the Board of Directors of defendant union and other participants at that conference. Included in the agreements as confirmed in the aforesaid letter were provisions that the nomination meeting would start at 9 a. m. on October 29, 1972, and that ". . . each other matter included in the assembly's agenda should take place after totally completing the nominations and the election of the Election Committee"; that there would be no ". . . speeches before or during the nominations proceedings and the election of the Election Committee"; that no ". . . propaganda was to be made on the premises of the [defendant union] prior to or during the nomination proceedings and the election of the Election Committee"; and that only bona fide members of [defendant union] would be allowed to participate in the nomination process and would be allowed into the assembly room where the nominations were to take place.

5. By letter dated November 9, 1972, addressed to the Board of Directors of defendant union by Mr. Frank, certain amendments to the agreements reflected in the October 20 letter were confirmed, including an amendment relating to the number of official ballots and sample ballots that were to be printed.

6. No disagreement with the terms and conditions under which the Secretary of Labor would supervise defendant's nominations and election, as reflected in the discussed correspondence, were registered by any representatives of the defendant union. Mr. Frank proceeded with his supervision of the nominations and election as scheduled, with the understanding and expectation that the agreements reached at the pre-nomination election conference would be adhered to.

7. Although there had been agreement reached at the pre-nomination election conference that only eligible members of defendant union would be allowed entry and participation in the nomination process, the defendant union initially allowed all individuals entry into the union hall where the nominations were to be conducted without any attempt to check the eligibility of members to participate in the nomination proceedings. It failed to provide tables to check eligibility requested by the election supervisor and began the meeting. When informed of the need to check eligibility, the chairman of the nomina-

tion meeting would not agree to require the attendees to leave the union hall so that eligibility could be checked before re-entry, but instead submitted the matter to a vote of the membership. Only after intervention of counsel of the defendant union were attendees persuaded to submit themselves to a check of eligibility before being allowed entry and participation in the nomination proceedings.

8. After receiving miscellaneous reports attending to other matters unrelated to the nomination proceedings, and prior to any nomination of candidates and election of the Election Committee, the President of respondent union, Mr. Félix Morales, addressed the assembly for approximately forty-five minutes. Mr. Morales' speech praised the accomplishments of the union under his long leadership, attacked the policies and personalities of the anticipated opposition candidates, and criticized the involvement of the Federal Government in the election proceedings and the behavior and decisions of the election supervisor.

9. Contrary to the agreement as to the nomination meeting agenda, Mr. Félix Morales, President of the defendant union and acting as chairman of the nomination meeting, called for miscellaneous reports, including a treasurer's report, reports regarding sick members and miscellaneous correspondence and resolutions, at the beginning of the nomination meeting. Although Mr. Frank advised representatives of the defendant union at the nomination meeting that prior agreements were being abrogated and that the nominations of candidates were to be the first order of business, no corrective action was taken by the defendant union.

10. The defendant union sponsored weather forecasts during the months of August, September and October 1972. These broadcasts were carried four times a day at 6:30 a. m., 8:30 a. m., 1:30 p. m., and 6:30 p. m. over radio stations WIAC, AM and FM, in San Juan, WISA, AM and FM in Isabela, WEUC in Ponce and WPRA in Mayaguez, and were paid for with $3,900 in union funds. Each broadcast contained not only reference to the medical and insurance plans of the members of the defendant union and the road building activities of the union, but also three times during each broadcast referred to the fact that the union was managed by Félix Morales and that arrangements were being made for the scheduled election.

11. Newspaper advertisements published on September 7, 9 and 10, 1972, attacked the candidacy of Mr. Morales' opponent, Luis Medina Lago. There was a publication of a resolution by the defendant union in the magazine Native Industries in August 1972. Native Industries is a magazine published in Puerto Rico with a circulation of over 10,-000 principally to manufacturers and employers; there is no distribution to laborers. The resolution as published in Native Industries only reported on an alleged improper and unjustified work stoppage purportedly in violation of an agreement by the defendant union and a particular employer. However, this same advertisement publicizing the resolution was published at union expenses in three San Juan newspapers on September 7, 1972, in EL IMPARCIAL, on September 9, 1972, in EL DIA, and on September 10, 1972, in THE SAN JUAN STAR. The cost of these newspaper advertisements amounted to $2,629 and was paid for with union funds. The resolution as published in the newspapers was essentially the same advertisement that appeared in the magazine Native Industries, with the exception that the following two paragraphs were added when the resolution was published in the newspapers:

On Tuesday, August 22, 42 workers of the firm R. B. Potashnick paralyzed the work of the Highway and invaded the office of the President of the Sindicato, Felix Morales, so that he would back the work stoppage in violation of the agreement.

For said motive, Felix Morales presented to the Assembly No. 255 of said Sindicato held on Sunday, Au-

gust 27 of the current year, a resolution which received the endorsement of the Assembly with the dissident vote of Luis A. Medina Lago.

Mr. Medina Lago was a candidate for President, opposing Mr. Morales in the supervised election, and was a longtime opponent of Mr. Morales.

12. Three campaign handbills advocating the candidacy of Mr. Morales were distributed prior to the election. The first handbill, dated November 16, 1972, accused Mr. Morales' opponent, Mr. Luis Medina Lago, of lying for the sixth time regarding the expenditure of certain union funds, and clearly attacked the candidacy of Mr. Medina Lago. The stencil for the handbill was prepared by Alejandrina Díaz Sánchez, a secretary employed on a salary basis by the union, and the preparation of the stencil was paid for with union funds. The Court has carefully considered the testimony of Mrs. Díaz Sánchez and gives her absolute credibility in all aspects of her testimony.

13. Another handbill, dated November 20, 1972, itemized several allegations against the two principal opposition candidates for President against the incumbent, and a third handbill, dated November 21, 1972, contained material which endorsed the candidacy of the incumbent President and other officers and members of the Board of Directors, who comprised the incumbent President's slate of offices.

14. The three handbills dated November 16, November 20, and November 21, 1972 were distributed to members of defendant union at several work sites in Puerto Rico. A salaried general organizer of defendant union made the distribution to workers during the regular workday and used the jeeps of defendant union to make such distribution The projects where the handbills were distributed were large, and there were many members of the union working on these projects who received these handbills.

15. Sample ballots marked for the candidacy of the incumbent President were distributed to workers at construction sites by a union organizer employed with union funds.

16. Advertisements attacking the candidacy of Mr. Morales' opponent were published in four newspapers in Puerto Rico on November 24 and November 25, 1972, immediately prior to the scheduled date of the election of officers of defendant union, on November 26, 1972. These advertisements attacked the candidacy of Mr. Medina Lago, an opponent of the incumbent President of the defendant union. The advertisements allege that statements made by Mr. Medina Lago regarding certain costs expended by the union were "totally false," and the advertisements purport to "publicly refute" statements made by Mr. Medina Lago regarding these expenditures. Mrs. Díaz Sánchez, a secretary utilized by the union on a part time basis, typed the copy of these advertisements and the salary paid her by the union covered the costs of these secretarial activities. The information for the copy was furnished by Mr. Morales and sent to her home.

17. Although the publicity agency handling the defendant union's account considered the individual members of the Board of Directors of defendant union accountable on a pro rata basis for the costs of the publication of the advertisements referred to in the preceding finding of fact, the advertisements were in the same general format as many other official union advertisements published and paid for by the defendant union, and contained the official union seal and photographs of the incumbent President and Secretary-Treasurer, who were also candidates in the scheduled election. The official seal of the union used contained the words in large type "Sindicato de Equipo Pesado de Puerto Rico 'los tigres de la Montaña'."

18. Any findings of fact that are contained in the following conclusions of law are expressly incorporated in the findings of fact as set forth herein.

### Conclusions of Law

1. The Court finds in all respects as set forth in the foregoing findings of fact that any conclusions of law that are

contained in said findings of fact are hereby expressly incorporated in these conclusions of law with the same force and effect as though herein expressly set forth.

2. The Court has jurisdiction over this action pursuant to the provisions of section 402(b) of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 482(b)).

3. At all times relevant to this action, defendant was a local labor organization engaged in an industry affecting commerce within the meaning of sections 3 (i) and 3(j) of the Act (29 U.S.C. §§ 402(i) and 402(j)).

4. While the Secretary was attempting to carry out the directions of this Court in supervising the defendant's nominations and election of officers, violations of Title IV of the LMRDA occurred (29 U.S.C. § 481).

5. Defendant violated section 401(g) of the LMRDA (29 U.S.C. § 481(g)) by allowing moneys of a labor organization to be contributed or applied to promote the candidacy of Félix Morales and members of his slate in the election. Section 401(g) of the Act provides:

> No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

6. The speech by the incumbent at the nomination meeting discussed in Findings of Fact No. 8; the newspaper advertisements referred to in Findings of Fact Nos. 11, 16 and 17; the handbills referred to in the Findings of Fact Nos. 12, 13 and 14; and the weather broadcast as discussed in Findings of Fact No. 10, all "constituted promotion of candidacy" of the incumbent President and members of his slate, within the meaning of section 401(g) of the Act. The tone and content of this propagandizing was to endorse and encourage the re-election of the incumbent President and other incumbents. Hodgson v. Liquor Salesmen's Union Local No. 2, 334 F.Supp. 1369, 1377 (S.D.N.Y., 1971); Yablonski v. United Mine Workers, 305 F.Supp. 868 (D.D.C., 1969); and Hodgson v. United Mine Workers of America, 344 F.Supp. 17 (D.D.C., 1972).

7. For example, the newspaper advertisements and the sponsorship of the weather forecast could arguably have some useful purpose in extolling the accomplishments and publicizing the activities of the union. Nonetheless, in considering the totality of the circumstances regarding the activities, there is reflected an intention to endorse and encourage the candidacy of certain individuals to the detriment of others. This is true even though certain of the activities incorporated in the preceding conclusion of law may have been partly motivated by a legitimate purpose. It is not necessary in order to establish a violation of section 401(g) of the Act that any of the advertisements, radio broadcasts or other challenged activities of the defendant union be totally or exclusively committed to endorsing specific candidates or attacking opposition candidacy. Wirtz v. Independent Workers Union of Florida, 272 F.Supp. 31 (D.C. M.D., Fla., 1967). Although they had some legitimate purpose, totally they enhanced the candidacy of certain individuals and albeit subtly encouraged the re-election of incumbents.

8. Similarly, the speech of incumbent President Morales (discussed in Finding of Fact No. 8) during the nomination meeting, constituted promotion of his candidacy within the meaning of section 401(g). The fact that no candidate had been officially nominated at the precise moment has no bearing on the issue. Yablonski v. UMW, 314 F.Supp. 616 (D.D.C.), Morrissey v. Curran, 356 F.Supp. 312 (S.D.N.Y.).

9. The prohibition of section 401(g) that no moneys received by any

labor organization be "contributed or applied to promote the candidacy . . ." proscribes either direct contributions from the union treasury or contributions made through the use of union facilities to promote the candidacy of an individual. The amount of money spent is not the test. The fact that an expenditure is "de minimis" does not make it any less a violation. Shultz v. Local Union 6799, United Steelworkers of America, 426 F.2d 969 (C.A.9 1970). The use of a union's hall by incumbent Morales in addressing the assembly at the nomination meeting, without an equivalent offer to other candidates to use such facilities, constituted the use of union facilities for personal campaign purposes.

10. The use of such facilities for the promotion of Mr. Morales' candidacy in direct contradiction of the pre-election agreement discussed in Finding of Fact Nos. 4, 6 and 8, without an equivalent offer to other candidates, constituted inadequate safeguards to assure a fair election in violation of section 401(c) of the Act.

11. The weather broadcasts and newspaper advertisements published in September, 1972, were directly paid for with union funds. The handbill dated November 16, 1972, was prepared by a secretary paid with union funds, and it along with the handbills dated November 20 and November 21, 1972, and the marked sample ballots discussed in Findings of Fact No. 15, were distributed to members by a union organizer paid with union funds. These handbills and sample ballots, all clearly advocating the election of incumbent Morales and his slate, were distributed during regular hours by a paid organizer who used the union jeep for transportation. While each of these acts or incidents alone would amount to an individual 401(g) violation, together they constitute a considerable expenditure of union funds in violation of section 401(g) of the Act.

12. Although the advertisements that appeared in four newspapers on November 24, and 25, 1972, immediately preceding the election, discussed in Findings of Fact Nos. 16 and 17, were billed to individual members of the Board of Directors, this is not determinative under the facts of this case. The secretary employed by the union was compensated with union funds for her activities involving the typing of these advertisements; the advertising agency which billed the Board of Directors for these advertisements was the union's regular publicity agency; the amount was carried on the agency's ledger as a union debt; the advertisements used the "logo" belonging to the union and gave every appearance of being an official statement of the union. Section 401(g) does not require an actual cash outlay by a union to establish a violation. The "logos" of the union, the credit and goodwill of the union, together with the time of the union secretary, constitute assets of a labor organization and these assets were contributed or applied to support Mr. Morales' candidacy.

13. Once a violation has been proved by a preponderance of the evidence, the existence of that violation establishes a prima facie case that the violation may have affected the outcome of the election. Wirtz v. Hotel, Motel and Club Employees, Local 6, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968). A section 401(g) violation has a potential for influencing every vote cast in an election in a way which is not susceptible of precise measurement. The plaintiff, in establishing the previously discussed violations of section 401 (g), has sustained his burden and has presented a prima facie case that the violations may have affected the outcome of the election. Sufficient evidence was not presented by defendant that the evidence did not affect the outcome.

14. Once intervention of the Secretary of Labor has been properly invoked in a court action and a supervised election ordered by the court, an election supervisor must be afforded a wide range of discretion in discharging

his supervisory responsibility. The function of the Secretary in supervising an election is not that of an interested observer. Congress chose supervised elections as a remedy for section 401 violations. If the union wishes to object to any action taken by an election supervisor in his supervisory capacity, the union assumes a heavy burden of persuasion and proof. Brennan v. Local 551, United Automobile, Aerospace and Agricultural Implement Workers of America, Inc., 486 F.2d 6 (C.A.7 1973). A labor organization cannot refuse to comply with the election supervisor's directives without bringing upon itself the Secretary's refusal to continue conducting an election or, as in this case, refusing to certify the results of such election.

15. This Court has conducted a full hearing on this matter. Both parties have been given an opportunity to fully argue the law. Although the Court excluded evidence relating to violence and threats to the election supervisor by the candidates subject to a proffer of evidence submitted at trial, the incidents occurred after the balloting and under the facts presented could not have affected the outcome of the election. However, as the Court indicated at the trial, this interference with the election supervisor in the performance of his responsibilities, although occurring after the balloting, can be considered in formulating a remedy.

16. Certification of an election is not a mechanical function. Hodgson v. Carpenters Resilient Flooring Local Union 2212, 457 F.2d 1364 (C.A.3, 1972). When it is apparent that an election was not conducted in accordance with the provisions of the Act, the Sec-

retary has not fulfilled his obligation if he certifies the result of an election.

17. Although the Court is highly pleased with the post-trial memorandum submitted by counsel for the defendant and his praiseworthy memorandum reflects a highly professional endeavor, the Court finds that this case is defenseless and, because of the violations which occurred which must have affected the outcome of the election conducted on November 26, 1973, this Court finds for the plaintiff, the Secretary of Labor, and will direct that defendant conduct a new election of officers in accordance with the accompanying Order.

The Court considers that the election irregularities found herein were not the product of wilful action by defendant or by its President, Mr. Félix Morales, but rather were caused by the unfamiliarity of defendant to the Labor-Management Reporting and Disclosure Act of 1959 and its procedures. Therefore, the Court is hopeful that in the forthcoming election of officers to be held by defendant as directed by the Court, none of these Findings of Fact and Conclusions of Law, nor any action of this Court, be used as part of the campaign against Mr. Morales or his fellow candidates. The Court would consider highly improper for any candidate to use any part of these judicial proceedings, or any words of the Court, as a means for politicking in the forthcoming union election. If this desire of the Court were not complied with by anyone, Mr. Morales may feel free to quote this last paragraph in its entirety, as long as any publicity to be made of it is paid for with non union funds.

Judgment shall be entered according to the foregoing Findings of Fact and Conclusions of Law.