461 F.Supp. 185 (1978)
Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff,
v.
LOCAL UNION 478, LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO, Defendant.
No. 77-56-Civ-JLK.
United States District Court, S. D. Florida.
November 15, 1978.
*186 Don R. Boswell, Asst. U. S. Atty., Miami, Fla., William H. Berger, U. S. Dept. of Labor, Atlanta, Ga., for plaintiff.
Miles J. Gopman, Mamber, Gopman, Epstein & Foosaner, North Miami Beach, Fla., for defendant.

ORDER GRANTING SUMMARY JUDGMENT
JAMES LAWRENCE KING, District Judge.

I. INTRODUCTION
This action was brought by the Secretary of Labor to set aside the election of the president of Local Union 478 of the Laborers' International Union of North America. It involves issues that are fundamental to the effective functioning of the labor market in this country. Namely, it concerns *187 the correlative rights of candidates for union office to campaign effectively and of union members to receive information concerning the candidates' positions on issues vital to union affairs. In brief, the issue in this case is whether a candidate's request for the distribution of literature was improperly denied by incumbent union officials and, if so, whether this refusal may have affected the outcome of the subsequent election.
The facts are undisputed, and this case is now before the court on cross motions for summary judgment. Based upon a careful review of the stipulated facts and the memoranda submitted by counsel, this court concludes that the union's refusal to distribute campaign literature was improper and that it may have affected the outcome of the election. Therefore, summary judgment is granted in favor of the Secretary of Labor. The election must be set aside, and a new election held under the supervision of the Secretary of Labor within 45 days from the date of this order.

II. THE FACTS
The defendant, Local 478, is a labor organization within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA).[1] At the time of the events at issue, this union was composed of approximately 1300 members. The office staff consisted of three full-time clerical employees, whose duties included, inter alia, bookkeeping, preparing financial reports, making job referrals, and performing mass mailings to the union membership. These mass mailings were made through the use of peel-off mailing labels which were supplied pursuant to a contract with a computer company.
On May 22, 1976, Samuel Jackson, the complaining candidate in this case, was nominated for the office of president, and was found formally qualified to run. Subsequent to his nomination, Jackson made an oral request to the incumbent president of Local 478 to have his campaign literature distributed by the union at Jackson's expense. This request was denied on the grounds that the office staff was busy with its regular work and did not have time to perform work on behalf of any candidate. Jackson was not offered the use of the peel-off mailing labels, nor was he informed of the existence of a contract for the supply of such labels.
At the same time that Jackson requested distribution of his literature, he also requested permission to use the union membership list within the union office. Initially, this request was denied also. However, another candidate subsequently requested the use of the membership list, and at that time, the union changed its position and permitted both candidates to copy the list by hand. As a result, Jackson was able to copy the names of approximately 400-450 members, and mail his campaign literature to those members.
The election was held on June 24, 1976. A total of 432 votes were cast for the office of president. Jake Wright received 229 votes and was elected president. Mr. Wright, although not the incumbent president, was an incumbent officer of the union at the time of the election. Robert Bradley, another candidate, received 104 votes, and Samuel Jackson received 99 votes.
Subsequently, Samuel Jackson protested the conduct of the election to the Laborer's International Union. He was afforded no relief by the International Union, and therefore filed a complaint with the United States Department of Labor. Upon investigation, the Department of Labor found probable cause to believe that a violation of Section 401(c)[2] of the LMRDA had occurred, and therefore instituted this action. The court now turns to a discussion of the law governing the issues in this case.

*188 III. THE LABOR MANAGEMENT REPORTING AND DISCLOSURE ACT

A. An Overview
The National Labor Relations Act[3] has been described as "the most radical piece of legislation ever enacted by the United States Congress."[4] This Act recognized the legitimacy of the labor movement, and conferred many rights upon the union designated by the majority of the workers as bargaining representative. These rights include the right to bargain with the employer over such matters as wages, conditions of employment, and grievance procedures.[5] In the years following this enactment, however, there became an increasing concern that the officials of the designated unions were abusing their powers to the detriment of the employees whom they were supposed to represent.[6] Out of this concern, LMRDA was born.
The goal of the LMRDA is to assure union responsiveness to its membership. One commentator described the importance of such responsiveness as follows:
The effects of unionism are undoubtedly to democratize industrial management in the sense that autocratic powers of employers are restricted by rules and regulations negotiated with representatives of the workers. . . . If labor organizations also exercise autocratic powers over their members, then workers may merely be substituting dictatorial rule of union officials for the arbitrary authority of the employer or his managers.[7]
Thus, the LMRDA is designed to protect the individual union members and is an indispensable vertebra in the backbone of the labor movement. One of the key sections of the LMRDA is Title IV, which guarantees union members that their leaders will be elected in a free and democratic election. Since it is Title IV which governs the dispute in this case, the court now turns to a discussion of the specific purposes and requirements of that section.

B. Union Elections
To begin this discussion, the court notes that the provisions of Title IV must be construed in light of the overall, fundamental purpose of the LMRDA to protect the rank and file from the potential of abuse by union officials. In this context, Congress has determined that the best way to afford such protection is through a statutorily protected union democracy. Since the core of union democracy lies in the election of union officers, this case involves issues which are crucial to the effectiveness of the legislative scheme.[8] As the Senate Report to the LMRDA states:
It needs no argument to demonstrate the importance of free and democratic union elections. Under the National Labor Relations and Railway Labor Acts the union which is the bargaining representative has power, in conjunction with the employer, to fix a man's wages, hours, and conditions of employment. The individual employee may not lawfully negotiate with his employer. He is bound by the union contract. In practice, the union also has a significant role in enforcing the grievance procedure where a man's contract rights are enforced. The Government which gives unions this power has an obligation to insure that the officials who wield it are responsive to the desires of the men and women whom *189 they represent. The best assurance which can be given is a legal guaranty of free and periodic elections. The responsiveness of union officers to the will of the members depends upon the frequency of elections, and an honest count of the ballots. Guaranties of fairness will preserve the confidence of the public and the members in the integrity of union elections.[9]
One of the primary ways in which the LMRDA guarantees such fairness is through section 401(c)[10] which permits each candidate for office to communicate his election platform to the membership through the distribution of literature.
This section provides, in pertinent part:
(c) Every national or international labor organization . . . and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office . . . to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members.[11]
In order to clarify the duty of the union with respect to this statute, the Department of Labor promulgated the following interpretative regulations:[12]
§ 452.67 Distribution of campaign literature.
The Act imposes the duty on the union and its officers to comply with all reasonable requests of any candidate to distribute his campaign literature to the membership at his expense. . . .
§ 452.69 Expenses of campaign literature.
. . . Since labor organizations have an affirmative duty to comply with all reasonable requests of any candidate to distribute campaign literature (at the candidate's expense), a union rule refusing all such distributions would not be proper, even though applied in a nondiscriminatory fashion. In view of the fact that expenses of distribution are to be borne by the candidate a labor organization may not refuse to distribute campaign literature merely because it may have a small staff which cannot handle such distribution for all candidates. If this is the case, the organization may employ additional temporary staff or contract the job to a professional mailer. . . .
Strict adherence to the above statute and regulations is of fundamental importance to all union members, candidates, and incumbent officers. As one commentator notes:
Communication is at the heart of electoral responsiveness. The function of opening the leadership to membership demands can only be performed through a flow of information between the aspiring candidates and the rank and file. Regardless of which candidate is elected, an election characterized by a substantial amount of communication regarding union policies should indicate to the victor the sources and depth of rank and file discontent and the level of existing support for alternative policies.[13]
Congress, therefore, insured union compliance with this, as well as the other election provisions, by providing that whenever a violation of section 401 may have affected the outcome of an election, that election must be set aside and a new election held under the supervision of the Secretary of Labor.[14] In order to effectuate the congressional intent, the courts have construed this provision liberally in favor of *190 the Secretary of Labor. Thus, in Wirtz v. Hotel Motel & Club Employees Union, Local 6,[15] the United States Supreme Court held that a violation of section 401 established a prima facie case that the outcome of the election may have been affected. The burden then shifts to the union to show that the outcome of the election was not affected. The Court reasoned that any proof relating to effect on outcome would necessarily be speculative, and that to require the Secretary of Labor to come forward with additional evidence after a violation was established would place too heavy a burden on the Secretary, and render the remedy practically worthless. On the other hand, interference with the internal affairs of the union is not warranted where the violation did not affect the outcome of the election. Therefore, proof of a violation does not automatically require that the election be set aside. Rather, the union is given the opportunity to rebut the prima facie case by presenting evidence that the violation did not affect the outcome.
Although Local 6 involved a violation of section 401(e), which prohibits the imposition of unreasonable eligibility qualifications on prospective candidates, the standards set forth in that decision have been applied uniformly to all violations of section 401.[16] In this case, therefore, this count must determine first whether the union violated section 401(c) by failing to comply with a reasonable request for the distribution of campaign literature, and if so, whether the union has rebutted the prima facie case that the outcome of the election was affected. It is to these determinations that we turn next.

IV. THE LAW AS APPLIED TO THE FACTS

A. Reasonableness of the Request
The request for the distribution of literature in this case was quite simple. Candidate Samuel Jackson approached the incumbent union officials and stated that he wanted the union to distribute his campaign literature, and that he would pay for the services of the office staff. The union responded by refusing to honor this request on the grounds that the office staff was busy with its regular work and did not have the time to perform work on behalf of any candidate.
Jackson also requested permission to use the union's membership list in the union office. Although this request initially was denied, the union subsequently granted the request.
On its face, it is difficult to imagine a more reasonable request for the distribution of literature. This is not a case where the candidate did not offer full reimbursement for the cost of the union's services; nor is it a case where the candidate wanted a selective distribution of literature to specific members; nor is it a case where the candidate sought numerous distributions of literature.[17] In this case, on the contrary, Samuel Jackson sought the simplest type of distribution  a one-time mailing to all eligible voting members of the union. Despite this appearance of reasonableness, however, the court does not end its inquiry here. Rather, we turn to an examination of the nature of the union's refusal, and the reasons for this refusal.
The union contends that it did not technically refuse the request made by Jackson, and alternatively, that the refusal was justified. The union's position regarding the first contention is that Jackson's request for the use of the mailing list and the distribution of literature gave the union the option of honoring either request. Stated another way, the requests were *191 equivalents, and Jackson's acceptance of the mailing list should be deemed acquiescence in the refusal of the union to perform the distribution. A careful examination of the record demonstrates the untenability of this position. At the outset, the court notes that the union initially refused both requests, and did not view them as alternative methods of compliance with section 401(c). Moreover, this court concludes specifically that distribution of literature by union staff is not synonymous with permission to copy by hand a union membership list. If Congress had intended to permit unions to avoid so easily a statutorily mandated duty, Congress would have included such a provision in the legislation. In this case, moreover, the union's actions appear to go beyond a mere dereliction of duty. The union had knowledge, which Jackson did not, that a computer company had entered into a contract to provide peel-off labels for mass mailings to the membership. Had the union been acting in good faith, at the very least it would have offered Jackson the use of this service. Thus the court concludes that the actions of the union constituted a refusal to distribute literature. We now turn to an examination of the justifications for this refusal.
The union contends that its actions were justified for two reasons. First, the union argues that it should be excused from compliance because the regular office staff did not have the time to perform such services on behalf of any candidate. However, such an excuse is specifically prohibited by the regulations promulgated by the Department of Labor.[18] These regulations are in accord with the underlying purpose of the statutory requirement of distribution. The best way to insure that the union members are well-informed regarding the policies of incumbent union officials and the possible contrasting views of opposition candidates is to provide for the distribution of literature. The union itself is in the best position to perform such a distribution in the most efficient manner. The union knows the names and addresses of all the eligible voting members and has access to the mechanisms for mass distribution.[19] In addition, the union is in a better position to employ outside help if necessary to perform the task. Congress, therefore, imposed the duty of distribution upon the union, provided, of course, that there is reimbursement for expenses by the candidate. A union cannot avoid this duty, and thereby silence its candidates, by imposing upon them an absolute refusal to distribute their literature.
The union has attempted to buttress its position by pointing out that the refusal was imposed in a nondiscriminatory fashion. However, this argument misses its mark. The purpose of the distribution requirement is to protect the right of the membership to a fair and open election in which all relevant issues are presented and discussed to the utmost. A refusal to distribute literature, albeit nondiscriminatory, deprives the membership of this right. The spirit of the LMRDA requires the union to do everything possible to see that the membership is informed as fully as possible about election issues and candidates, but in this case the union apparently strove for the opposite result. The court cannot sanction such actions.
The second justification offered by the union is that the request was unreasonable, and therefore the union was excused by the terms of the statute from compliance with this request.[20] According to the union, the unreasonableness stems from certain omissions that occurred at the time of the request. Specifically, Jackson did not *192 tender a cash payment for the services he sought, and Jackson did not apprise the union of the extent of the literature which he wanted the union to distribute. The court concludes that these "omissions" do not render the request unreasonable, nor do they otherwise justify the refusal to distribute literature. The union neither informed Jackson of the expected costs nor requested such a tender of funds. Under these circumstances, Jackson's express offer of payment was all that was required. In addition, the union did not inquire as to the extent of the literature in question before refusing the distribution request. In the absence of such an inquiry, this lack of information does not make a request for distribution unreasonable.
The court therefore concludes that the union refused to honor a reasonable request for the distribution of literature, in violation of section 401(c) of the LMRDA. The court now turns to an examination of the effect of this violation.

B. The Outcome of the Election
Since a violation of section 401 has been established, we start with the proposition that the plaintiff has established a prima facie case that the outcome of the election may have been affected. The appropriate place to begin this discussion, therefore, is with an examination of the facts and arguments which the union has mustered to rebut this prima facie case. The union contends that the effect upon the election should be determined by examining the relationship between the votes received by the prevailing candidate and the total votes cast. In this case, Wright received over 50% of the votes cast, and Jackson received less than 25% of the votes cast. In addition, to demonstrate the ineffectiveness of the literature that Jackson was able to distribute, the union relies on the fact that Jackson distributed literature to approximately the same number of people as those who voted in the election. The union also emphasizes the fact that neither of the other competing candidates distributed any literature to the membership.
After carefully reviewing the record, the court concludes that the union has not met its burden of persuasion. The arguments advanced by the union are too speculative to rebut the prima facie case. The court notes, in this connection, that only one third of the total membership, or 432 persons, voted in the election. In addition, as a direct result of the union violation, over 800 members did not receive campaign literature from Jackson. If only one fifth of those members who did not receive literature had voted for Jackson, then he would have won the election. The court also notes that the winner of the election, Wright, already had union wide exposure by virtue of his previous office in the union. Thus, the distribution of literature by Jackson was even more crucial to his campaign. This court concludes that the refusal to distribute literature deprived both the candidate of his right to campaign, and the membership of its right to receive information concerning the election issues. The union has not met its burden of persuasion that this deprivation did not affect the outcome of the election, and therefore the election must be set aside.[21]

V. CONCLUSION
In sum, this court holds that the absolute refusal of Local 478 to distribute any literature on behalf of candidate Samuel Jackson was a violation of section 401(c) of the LMRDA. The court also concludes that this violation may have affected the outcome of the election for the office of president. Therefore, summary judgment is entered in favor of the plaintiff, the Secretary of Labor. The results of the disputed election are set aside, and the union shall hold a new election for the office *193 of president under the supervision of the Secretary of Labor within 45 days from the date of this order.
DONE AND ORDERED in chambers, at the United States Courthouse, at Miami, Florida, this 15 day of November, 1978.
NOTES
[1] 29 U.S.C. §§ 401-531 (1976).
[2] 29 U.S.C. § 481(c).
[3] 29 U.S.C. §§ 151-168 (1976).
[4] Klare, Judicial Deradicalization of the Wagner Act and the Origins of Modern Legal Consciousness, 1937-1941, 62 Minn.L.Rev. 265 (1978).
[5] For a detailed description of the National Labor Relations Act, see Klare, supra.
[6] Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819 (1960); S.Rep.No.187, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Admin.News, p. 2318.
[7] W. Leiserson, American Trade Democracy 54 (1959).
[8] See Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L.Rev. 819, 842, (1960); Note, Union Elections and the LMRDA: Thirteen Years of Use and Abuse, 81 Yale L.J. 407 (1972).
[9] 1959 U.S.Code Cong. & Admin.News, p. 2336.
[10] 29 U.S.C. § 481(c) (1970).
[11] Id.
[12] 38 Fed.Reg. 18324 (1973).
[13] Note: Union Elections and the LMRDA: Thirteen Years of Use and Abuse, 81 Yale L.J. 407, 452 (1972).
[14] 29 U.S.C. 482(c) (1976).
[15] 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968).
[16] See, e. g. Usery v. Stove, Furnace & Allied Appliance Workers International Union of North America, 547 F.2d 1043 (8th Cir. 1977); Marshall v. Plumbers and Steamfitters Local 654, No. 1-76-30 (N.D.Tex. June 2, 1978); Brennan v. Sindicato Empleados de Equipo Pesado, Construction Y. Ramas Anexas de Puerto Rico, Inc., 370 F.Supp. 872 (D.P.R.1974).
[17] Marshall v. Plumbers and Steamfitters Local 654, supra. See 29 C.F.R. §§ 452.68, 69, for a discussion of the duty of the union to comply with these special requests.
[18] 29 C.F.R. § 452.69 (1978).
[19] The court notes that the record in this case reflects that one of the customary duties of the office staff was to perform such mass mailings, and that the union had entered into a contract for the supply of peel-off labels for this purpose.
[20] The relevant statute, 29 U.S.C. § 481(c), provides in pertinent part:

(c) Every . . . labor organization . . shall be under a duty . . . to comply with all reasonable requests of any candidate to distribute . . . literature.
[21] The court realizes the difficulty of proof which is faced by the union. Perhaps, the only time that this burden could be met would be in a situation where the candidate was able to distribute all, or almost all, his literature despite the refusal of the union to assist him. However, that is not the situation in the case at bar and the court concludes that the distribution of the remainder of Jackson's literature may have affected the outcome of the election.