Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,

and

Peter Karagozian, Plaintiff-Intervenor,

v.

LOCAL 299, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, Defendant.

Civ. A. No. 78–72183.

United States District Court, E. D. Michigan, S. D.

June 9, 1981.

---

Allen H. Bean, U. S. Dept. of Labor, L. Michael Wicks, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

James P. Hoffa, Hoffa, Chodak & Robiner, Detroit, Mich., David Leo Uelmen, Gerry M. Miller, Goldberg, Previant, Uelmen, Gratz, Miller, Levy & Brueggeman, Milwaukee, Wis., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

On May 20, 1981, the court entered a brief order under 29 U.S.C. § 482(c) decreeing that the individuals elected as officers of defendant Local in an election supervised by the Secretary of Labor are the officers of the Local. This memorandum opinion sets forth the reasoning behind that ruling.

This case involves the question of what standards should be applied to a supervised election of union officers under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401, *et seq.* It involves the question of the proper balance to be struck between the duties of the Secretary of Labor during the course of a supervised election to see that a fair election is held, and the drastic nature of post election remedies, in deciding whether or not to order a third election. It involves also the question of how rapidly the Secretary should act after objections are made to a supervised election.

This action was filed by the Secretary of Labor in 1978. The Secretary's suit was brought under § 402 of the Labor-Management Reporting and Disclosure Act (hereinafter "Act"), 29 U.S.C. § 482. This statute allows the Secretary of Labor to file an action in federal district court seeking to have the results of a union election set aside on the ground that violations of the Act's provisions relating to election procedures, 29 U.S.C. § 481, may have affected the outcome of the election. After the Secretary of Labor filed this action, the parties stipulated that an election would be con-

ducted by the Local under the supervision of the Secretary. This stipulation was entered into to avoid the necessity for trial and contained an express statement that it was not to be construed as an admission on the part of the defendant that any violation of the Act occurred.

Pursuant to the stipulation, an order was entered requiring that the supervised election be held on or before May 31, 1980, for the term of office ending December 31, 1982, for all officers. Installation of the elected officers was to be completed by July 1, 1980.

The supervised election was conducted on May 30, 1980. Following the election, the Secretary of Labor received complaints concerning the conduct of the election. The Secretary conducted an investigation, and concluded, on January 7, 1981, that the results of the supervised election would not be certified and that a second supervised election would have to be held. This conclusion was based on the Secretary's findings that three violations of the Act occurred during the course of the supervised election. Although the Secretary received several complaints regarding alleged violations of the Act, he relied on only three in making his decision not to certify the results of the election.

On February 18, a Pre-Election Conference was conducted by the Area Administrator of the Labor-Management Services Administration. The Summary of this conference sets forth the planned election timetable for the second supervised election. This timetable provided for the election and installation of new officers by April 29, 1981.

Shortly after the conference, defendant Local filed a motion to set aside the Secretary's administrative ruling not to certify the results of the supervised election and for a stay of the second supervised election. The Local argued that the Secretary's deci-

sion not to certify the results of the supervised election was arbitrary, capricious and contrary to law. In response to defendant's motion, the Secretary of Labor filed a motion to require the defendant Local to conduct a second supervised election. The court conducted an evidentiary hearing and heard oral arguments on the respective claims.

Before the court are the parties' cross motions concerning the effect that should be given to the supervised election conducted on May 30, 1980. Plaintiff Secretary maintains that three violations of the Act occurred that may have affected the outcome of the election and that a second supervised election is therefore necessary. Defendant Local maintains that the results of the first supervised election should be certified on numerous grounds. The Local argues: first, that the alleged instances of misconduct do not amount to violations under the Act; second, that even if there were violations, they did not affect the outcome of the election; third, that if the court were to find that the instances of misconduct do constitute violations which may have affected the outcome of the election, an order requiring a second supervised election would violate the First Amendment; and finally, that the Secretary's delay in investigating the complaints, and his consideration of complaints filed more than 10 days after the election, should prevent the Secretary from conducting a second supervised election.

The supervised election conducted on May 30, 1980, involved a contest between three slates: the Bob Lins Team, headed by then-incumbent president Lins; the Concerned Teamsters, headed by Peter Karagozian; and Teamsters for a Democratic Union (TDU), headed by Peter Camarata. The Concerned Teamsters and TDU ran for the seven positions on a cooperative basis—neither slate ran candidates in opposition to the other. The results of that election were as follows:

| | Bob Lins Team | Concerned Teamsters | TDU | Independents |
|---|---|---|---|---|
| Pres. | Lins (3,332) | *Karagozian (3,687) | | |
| V.P. | *Banks (3,509) | | Camarata (2,801) | |
| Sec.-Treas. | Grayhek (3,182) | *Zimmers (3,518) | | Arlington (208) |
| Rec. Sec. | *Morisette (3,417) | | Carothers (2,624) | |
| Trustees | Holsinger (3,253) *Davis (3,299) Bitoni (3,103) | *Lane (3,437) Scalf (3,230) *Albert (3,317) | | Hartman (309) Kaytar (262) Pace (443) |

*Denotes winner

As noted above, the Secretary found that three violations of the election procedures provision of the Act, 29 U.S.C. § 481, occurred during the course of the supervised election. Two of these violations concerned complaints filed by the Lins Team, and one concerned a complaint filed by the Karagozian-Concerned Teamsters slate.

The Lins Team alleged, and the Secretary found, that in two instances employer funds were used to support the candidacy of Peter Karagozian, in violation of § 481(g) of the Act. The first of these violations involved the displaying of signs containing Karagozian's name at the Whiteway Restaurant. The Secretary found that the restaurant is an employer within the meaning of the Act. The second violation found by the Secretary concerns the payment of the printing costs for dinner-dance and donation tickets for Karagozian's campaign by the law firm of Levine & Benjamin. The printing costs totaled $140.92. The Secretary found that the law firm was also an employer within the meaning of the Act.

The Karagozian-Concerned Teamsters slate alleged, and the Secretary found, that the Lins Team discriminated in the use of lists of members and employers in violation of § 481(c). The Secretary's investigation disclosed that Vice-Presidential candidate Peter Camarata requested access to lists of members from the Local, and that he was told that the Union did not have the lists. The Secretary found, however, that the Lins Team did have lists which were used in a telephone campaign to solicit support for the Lins slate.

As to the violations found by the Secretary to have been committed by the Karagozian-Concerned Teamsters slate, the Secretary found that all offices won by that slate may have been affected thereby. As to the violations found by the Secretary to have been committed by the Lins Team, the Secretary found that all offices won by that slate may have been affected thereby. Thus, the Secretary sought to have a second supervised election for all offices.

As noted above, an evidentiary hearing was held in this case during which testimony concerning the violations found by the Secretary was received. Following are the court's Findings of Fact:

### AS TO THE SIGN

A sign bearing the name of "Karagozian" in large letters, easily seen from west bound Eight Mile Road, in Warren, Michigan, was placed over the door of a restaurant owned by the wife of a Teamster friend of Karagozian. She was an employer. She did not hang the sign herself. It was hung by her husband, a member of the union. Other political signs advertising persons running for elective offices had been displayed in the windows of the restaurant during national, state and local political campaigns. Eight Mile Road is a heavily traveled street and many Local 299 drivers use this route. Some of them patronize the restaurant. The sign had originally been hung over one of the freeways in Detroit, but was taken down when public authorities objected. Persons in charge of supervising the election knew of the sign display. Karagozian did not hang the sign, nor was he requested by the election supervisor to see that it was removed.

### AS TO THE TICKET PRINTING

A law firm that had represented Karagozian paid approximately $140.00 to print tickets to a fund raising affair for Karagozian. An advertisement for the law firm was placed on the reverse side of the tickets. The law firm was an employer. The affair was attended by no more than 200 persons, all friends of Karagozian. It was a money loser. The objection to this conduct was not made until June 13, more than 10 days after the close of the election.

### AS TO THE CALLING LISTS

Workers for the Lins Team used lists of union members to aid in making "Get Out the Vote for the Lins Team" telephone calls. The record does not indicate that these were official lists of members kept by the union. The record indicates that they were lists kept by various union stewards. The telephone campaigners were not requested to cease this activity by the persons supervising the election. The objection to this conduct was not made until August, two and one half months after the close of the election, and was filed at that time at the invitation of the persons supervising the election while the investigation of the charges made by the Lins Team was being conducted.

### IN GENERAL

The union has lost a substantial number of members, dropping from approximately 15,000 to less than 10,000 members. The cost of the supervised election to the union was $41,000.00. The respective contending slates spent in the neighborhood of $15,000.00 each on the supervised election. Karagozian still owes $7,000.00 on the last election. Elections of this sort weaken the union and disrupt its business. Employers take advantage of the union during elections of this sort. The time of the officers is taken up on matters not productive of the union business. The rules under which the election was held required objections to be made before, during or within 10 days after the election. After the supervised election was held, the elected officers were installed as officers of the union, without objection from the plaintiff Secretary.

The charged violations could be classified as violations if they had occurred in an unsupervised election. *See, e. g., Marshall v. Local Union 20, International Brotherhood of Teamsters*, 611 F.2d 645 (6th Cir. 1979); *Hodgson v. Liquor Salesmen's Union, Local 2*, 334 F.Supp. 1369 (S.D.N.Y.), aff'd, 444 F.2d 1344 (2d Cir. 1971); *Marshall v. Local Union 933, United Automobile Workers*, Civil Action No. IP 78–57–C (S.D. Ind. January 28, 1980); *Marshall v. Local Union 70, International Brotherhood of Teamsters*, 103 L.R.R.M. 2396 (N.D.Cal. 1979). On the assumption that the nature of what are in fact violations of the law does not change because the election was supervised, the court must determine whether the effect of such violations is the same or is different in such an election. The court believes that the violations are so minor and insubstantial in a second election held under the supervision of the Secretary,

that it is not possible for this court in this second election to find that they "may have affected the outcome" of the election. Two of the violations were not made within the time established by the rules for making objections. The Secretary did not take steps during the election to straighten out any alleged infractions of the rules. The Secretary delayed for more than 7 months after the election and more than 6 months after he allowed the elected officials to assume office before he indicated that he believed the election should be voided. This is too long a time to allow the kind of relief he seeks.

## DISCUSSION

The statute under which this suit is brought sets forth the procedures and standards to be followed to challenge an unsupervised election and to require a supervised election. Under 29 U.S.C. § 482(a), a member of a labor organization may, after exhausting internal remedies, file a complaint concerning the conduct of an election with the Secretary of Labor. Subdivision (b) requires the Secretary to investigate the complaint, and, if he finds probable cause to believe that a violation of § 481 occurred which has not been remedied, allows him 60 days from the filing of the complaint to file a civil action to have the election set aside and to direct that a new election be held under his supervision. Subsection (c) states that if the court, after a trial on the merits, finds that a violation of § 481 may have affected the outcome of the election, it shall declare the election to be void and direct the conduct of a new election under the supervision of the Secretary. Following the election, the Secretary is to promptly certify to the court the names of the persons elected, and the court is then directed to enter a decree declaring such persons to be the officers of the labor organization.

The statute is silent as to the standards governing challenges to a supervised election. Integral to the proper resolution of such challenges are questions involving the period of time within which the Secretary should be required to act in response to complaints concerning the conduct of the supervised election, and the appropriate standard of review of the decision not to certify the results of the election. The court believes that the standards described below for these matters are correct and fully supports the conclusion that the officers elected in the supervised election must be decreed to be the officers of the Local, and that the Secretary should be prevented from holding another supervised election.

The Act is designed to support the concept of internal autonomy in the union election process if the union constitution, by-laws, and election rules, and the activities of those persons interested in the elective process do not overreach and prevent a fair election. In other words, each union is authorized to conduct its own election according to its own rules the first time around so long as those rules and those interested in the election comply with the standards of fairness set forth by law. Such an election cannot be overturned by the union, its members or the Secretary of Labor, without court action. When a second election is ordered, the second election is conducted under the direction, control, and rules of the Secretary and is policed by him. This is done to make certain it is fair.

The fairness of the first election must be determined by post election examination. The second election, however, is much different. It operates more like a public governmental election, with the government supervising it throughout. In the second election, the Secretary's agent is there to receive complaints as the campaign progresses. He is there to straighten things out before they cause damage. Presumably, the Secretary's agent is capable of giving attention to the election to insure its fairness. We rely on the Secretary's efforts during the course of the election to see that the election is fairly run rather than relying solely on the post election remedy of voiding the election. The election conducted under the auspices of the Secretary is entitled to a greater presumption of fairness than is an election conducted outside the oversight of the public protector of elections.

Finally, the conduct of elections is not a game or sport. Elections are expensive, and disruptive of the union's business. It is in the interest of the membership of the union and union democracy to provide finality to the election process and not to compel further elections after an election supervised by the Secretary unless it can be shown that the conduct is grievous and may have affected the outcome of the election.

All of this is relevant in examining the charges made in this case to prevent the certification of the election conducted under the Secretary's direction.

*Imposition of Appropriate Time Constraints*

A supervised election is held only after having been ordered by the court and is held under the auspices of the court. As noted above, § 482(c) requires that after a supervised election is conducted, the Secretary is to "promptly" certify to the court the names of the individuals elected. This language does not require the Secretary to certify the results of the election in all cases. *Brennan v. Sindicato Empleados de Equipo Pesado*, 370 F.Supp. 872 (D.P.R. 1974); *Hodgson v. Chain Service Restaurant Luncheonette & Soda Fountain Employees Union, Local 11*, 355 F.Supp. 180 (S.D.N.Y.1973). Procedures must be available to protect union democracy if an investigation discloses that violations of the Act occurred during the conduct of the election. Nonetheless, the fact that the statute requires "prompt" certification implies that the Secretary must act "promptly" in making its investigation of complaints received concerning the conduct of the supervised election, and in making the administrative decision whether to certify in an expeditious manner. *Donovan v. Blasters, Drillrunners and Miners Union, Local 29*, Civ. No. 78 Civ. 4619 (S.D.N.Y. May 6, 1981).

Support for this reading of the statute is drawn from the provisions of § 482(b) which require that the Secretary file a civil action under the Act within 60 days after the filing of a complaint as to an unsupervised election by a member of the labor organization. At least in the context of challenges to an unsupervised election, Congress has

displayed a concern for the disruption to normal union activity by requiring that complaints regarding the conduct of an election be processed expeditiously and has limited the time during which challenges to the incumbent officers can be made. *See also*, § 482(a).

In *Marshall v. Local U. 1374, International Assoc. of Machinists and Aerospace Workers*, 558 F.2d 1354 (9th Cir. 1977), the court held that the 60 day time limit contained in § 482(b) is not jurisdictional in the sense that an untimely suit is necessarily barred. The court reviewed cases in which the 60 day time period was extended for cause shown, and concluded that the time limit is a "directive to the Secretary of Labor and the court should consider the rights of all parties affected to evaluate what action will best serve the purposes of the statute." *Id.* at 1357–58. This court adopts this balancing approach as the governing standard to be applied in this case. This standard requires consideration of the rights and interests of the parties in the case, the purposes of the statute, and also whether any reason has been shown which would excuse the lengthy delay involved in this case.

It is not surprising that the identifiable interests of the parties affected in a case such as this correspond with identifiable purposes of the statute. There is first the interest of the Local's membership in being led by officers elected in a fair, open, and untainted election. This interest has been expressly recognized by Congress in its declaration of findings, purposes, and policy in 29 U.S.C. § 401. Second, there is the interest of the membership and the labor organization as an institution in the prompt resolution of challenges to labor elections, and to "settle as quickly as practicable the cloud on the incumbents' titles to office." *Dunlop v. Bachowski*, 421 U.S. 560, 569, 573, 95 S.Ct. 1851, 1858, 1860, 44 L.Ed.2d 377 (1975). That this is also a purpose of the statute is evidenced by § 482(a) and (b).

While these identifiable interests may appear to be in conflict, they need not

be. "In other words, 'Congress wished to maximize union democracy at minimal cost to union effectiveness.'" *Donovan v. Blasters, Drillrunners and Miners Union, supra,* citing *Usery v. Local Union No. 639, International Brotherhood of Teamsters,* 543 F.2d 369, 374 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977). In the type of situation presented by this case, it is appropriate to consider the severity of the violations and the probable effect on the election's outcome in determining whether the Secretary's delay should be excused. The accommodation of the potentially competing interests identified above cannot be made without reference to the character of the violations found to have existed in the election. While an egregious violation which in all likelihood had an effect on the outcome of an election may be cause to require the conduct of a second supervised election in spite of considerable delay by the Secretary in investigating the charge and in making a decision, a de minimus violation with doubtful effect should not permit the Secretary to upset normal union governance for long periods where there has been considerable delay on his part. Allowing the Secretary in the latter situation to challenge the results of the election would further neither objective of the statute, and the parties' interests in union democracy and effectiveness would be lost in an exultation of form over substance.

■ The three violations found to exist in this case are not of such an egregious character as to justify the lengthy delay on the part of the Secretary in investigating the complaints received and in issuing his decision. Two of the violations, the sign violation at the Whiteway Restaurant and the payment of the cost of printing fund raising tickets are of a technical nature and had no discernible effect on the election. The violation involving the use of membership lists for the telephone campaign is not sufficient in this court's view to require that a second election be held, even if it were limited to only the offices currently held by members of the Lins Team. In addition, the record discloses that the com-

plaining parties withdrew this charge before it was presented to this court. The three violations here are aptly characterized as minor. To require that the supervised election be set aside and that a second supervised election be held would not further the goals of union democracy and would impair union effectiveness. Seven months passed between the date of the election and the Secretary's decision not to certify the results of the election. If the second supervised election had been conducted as planned, 11 months would have elapsed between the first and second elections. During this time, the Local was run by the officers elected in May of 1980. During this time, doubt was cast on their titles to office by reason of the challenges made.

Moreover, it is worthy of emphasis that the Secretary advanced no reason for the lengthy delay in issuing the decision not to certify the results of the election. Delays occasioned by the complexity of the complaints filed, or occasioned by a lack of cooperation on the part of union officers could, in the appropriate situation, excuse a significant lapse of time between the date of the election and the date of the decision not to certify. However, the Secretary has offered no reasons specifying why the delay was necessary in this case. When an investigation takes considerably longer than the 60 day period established by Congress in § 482(b) for unsupervised elections, it is only reasonable to require the Secretary to justify the delay in specific terms.

■ Because the violations found to have existed in this case were of a minor character with no factual showing supporting the Secretary's bald conclusory statements that the violations may have affected the outcome of the election, because the delay between the date of the election and the date of the decision not to certify the results of the election was considerable, and because no excuse has been specifically set forth seeking to justify the length of the delay, the Secretary will not be permitted to hold a second supervised election in this case. This result furthers the goal of union de-

mocracy and puts an end to the impairment of union effectiveness by reason of the cloud on the elected officials' titles to office.

*Standard of Review of a Decision Not to Certify the Results of a Supervised Election*

 A second and independent reason exists for not permitting the Secretary to hold a second supervised election in this case. This reason is simply that the Secretary has not made a sufficient showing of the probable effect of these violations on the outcome of the supervised election. Initially, the Secretary asserted that he had the right to order a second supervised election without an order of the court. The Secretary has also maintained that his decision not to certify the results of the supervised election is subject to reversal only if it is shown to be arbitrary, capricious, or otherwise contrary to law. For the reasons that follow, the court believes that an order of the court is required and that the arbitrary and capricious standard is particularly inappropriate in this type of case. This conclusion is indicated by analysis of the standard of review and burden of proof allocation employed in other aspects of § 482 litigation, and by the policy of the statute itself.

 Before an unsupervised election can be set aside and a supervised election held, the Secretary must file suit to have that election set aside. He has no authority to set aside the election himself, but must prove in court that violations occurred that may have affected the outcome of the election. If he meets this burden, the trial court declares the election to be void and directs the conduct of a supervised election. Section 482(c).

In this case, the Secretary advanced the view that he did not require the permission of the court to hold a second supervised election. It was only after the Local filed a motion to compel the Secretary to certify the first supervised election that the Secretary filed his motion to require a second supervised election.

 This court holds that the Secretary should not be able unilaterally to require that union affairs be disrupted for a second time without the court's permission. The supervised election was held pursuant to court order and the statute requires certification of the results to the court. The court did not direct the Secretary to hold two elections but directed that he should hold one election and see to it that it was fairly conducted. In this court's view, permission of the court is required to conduct a second supervised election.

 As noted earlier, § 482 addresses only the procedures and standards governing challenges to an unsupervised election and the ordering of a supervised election. Under § 482(a), a member of a labor organization may file a complaint concerning the conduct of a union (unsupervised) election with the Secretary of Labor. If the Secretary investigates the complaint and concludes that a civil action to have the election set aside is not warranted, that decision is subject to review under the arbitrary and capricious standard. *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). In order to enable the reviewing court to properly assess his decision, the Secretary must provide the court with a statement of reasons supporting his determination. Except in rare instances, the "full trappings of adversary trial-type hearings" are not allowed where the Secretary's decision not to file suit is challenged. *Id.* at 572–73, 95 S.Ct. at 1860–61.

*Bachowski* has been properly applied to challenges made to the Secretary's decision *to certify* the results of a supervised election. *Usery v. Local U. 639, International Brotherhood of Teamsters*, 543 F.2d 369 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977). The use of the *Bachowski* "arbitrary and capricious standard" in this situation is appropriate because the results of both determinations—not to file suit and to certify the results of the supervised election—retain the status quo. Union affairs are not disrupted in either setting. The incumbent officers' titles to office are left unclouded,

and they are allowed to serve the remainder of their terms.

Where the Secretary investigates a complaint concerning the conduct of an unsupervised election and makes the determination to file suit to have that election set aside, he bears the burden of proving the existence of violations during the conduct of the election and that they may have affected the outcome of the election. If he meets this burden, the trial court declares the election to be void and directs the conduct of a supervised election. § 482(c).

In *Wirtz v. Hotel, Motel & Club Employees U, Local 6*, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968), the Supreme Court held that, in cases involving unsupervised elections, proof of a violation established a prima facie case that the violation may have affected the outcome. This shifts the burden to the union to rebut the prima facie case with evidence that the violation did not affect the result. *Local 6* has been held to govern cases involving single or minimal violations of § 481 in the context of a civil action to have an unsupervised election set aside.

> If there is only a single violation and a minimal one at that, it may be more easily rebutted, but it must be met by evidence which supports a finding that the violation did not affect the result. *Usery v. Stove, Furnace & Allied Appliance Workers*, 547 F.2d 1043, 1046 (8th Cir. 1977).

When the Secretary succeeds in obtaining an order requiring that an election be set aside and then conducts a supervised election, the results of which he declines to certify, his decision disrupts union internal affairs for a second time. In this situation, he is seeking to set aside the vote of the membership in an election conducted under the auspices and control of the government and is claiming, in effect, that the conduct has been so egregious that for a second time a new election must be held. All this is done with the apparent aim of furthering the goal of union democracy. We do not, however, treat public governmental elections so cavalierly. In the context of a

court ordered election, the Secretary supervises the union election. His goal is to see that the rules are followed so as to have a fair election. He should adopt an active role and step in and correct infractions as they occur and should not assume a passive role of non-interference on the threat of setting aside the resulting election. Otherwise, there would be no difference between a supervised and an unsupervised election and even a cursory reading of § 482 suggests that this is not so.

In seeking the permission of the court to conduct a second supervised election, the Secretary must do more than simply show that his decision is not arbitrary or capricious. Such a standard of review is appropriate where the results of his decision are to certify and retain the status quo and to allow the incumbents to serve their constituency for the duration of their terms. However, as in the situation in which he seeks to have an election set aside, the Secretary must prove that there were in fact violations that occurred during the conduct of the supervised election which may have affected the outcome of the supervised election. Moreover, he must do more than merely assert that the violations may have affected the outcome in a supervised election. He must be able to point to facts from which the court can make this determination.

Clearly in a supervised election a different burden must be met and a different standard applied than in an unsupervised election. It may be well to provide that the union has the burden of showing that a violation did not affect the result in an unsupervised election. *Wirtz v. Hotel, Motel & Club Employees U, Local 6, supra.* The application of the burden of proof allocation set forth in *Local 6* is not, however, appropriate for a supervised election. In *Local 6*, the Secretary was seeking a ruling to have an election declared void, an election in which he played no supervisory role. Imposing on him the burden of proving that a violation may have affected the results of that election would, in many cases, be tantamount to requiring him to prove the un-

provable. Such a requirement would indeed render the proposed remedy of § 482 "practically worthless." *Local 6, supra,* 391 U.S. at 496–97, 88 S.Ct. at 1746–47. In this situation, the burden of proving that the violations did not affect the outcome of the election is appropriately placed on the union.

■ The situation is vastly different, however, where the Secretary seeks to have an election in which he played a supervisory role set aside. Such an election is conducted under the guidance of an election supervisor, and that supervisor is afforded a wide range of discretion in discharging his supervisory responsibility. *Brennan v. Sindicato Empleados de Equipo Pesado, supra,* 370 F.Supp. at 879. Such an election is itself the remedy for violations committed in an earlier election. Such an election must, then, have a presumption of regularity in the absence of the Secretary's development of facts to show how the violations may have affected the results. Bald conclusory statements do not meet this standard.

In this case, the violations found to have existed were of a technical and minor nature. Their effect on the outcome of the election has not been shown and is doubtful at best. The margin of victory for all offices is sufficient to discount the possibility that the violations may have affected the outcome of the supervised election. At least in this situation, application of *Local 6*'s burden of proof is unwarranted. Such a burden, requiring that the Local prove that the violations *did not affect* the outcome, is an impossible one to meet on the facts of this case. Because these violations occurred during the conduct of a supervised election, the presumption of regularity which attaches to that election tips the balance against the Secretary's request for permission to hold another supervised election. In the context of a supervised election in which only technical violations occurred, it is appropriate to impose on the Secretary the burden of proving their probable effect. This burden has not been met in this case.

■ This conclusion is supported by the policy underlying the Labor-Management Reporting and Disclosure Act itself. As noted above, this Act reflects twin goals of furthering union democracy while minimizing any impairment to union effectiveness. Repeated challenges to elections in which only technical violations occurred impairs union democracy and drastically affects the ability of the officers to discharge their duties. In addition, union funds are depleted by the costs of rerun elections. While it is possible that more egregious violations may warrant the setting aside of a supervised election, certainly the kind of violations found in this case do not require this result in the absence of proof of their probable effect.

■ In summary, the officers of the Local elected in the supervised election conducted on May 30, 1980 are properly decreed to be the officers of the Local, both because of the Secretary's delay in investigating the complaints received and issuing his decision not to certify, and because of his failure to prove the probable effect that these violations had on the outcome of the election. The court will not, however, require the Secretary to certify the results of the election in the face of his representation that he cannot, under the statute or the prior order of the court, certify that the officials are the duly elected officers of the Local. Instead, the court finds it appropriate to simply enter its order under § 482(c) decreeing the officers elected in the May 30, 1980 election to be the officers of the Local. These officers will serve out the remainders of their terms.

So ordered.